**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

EARL WHITTLEY DAVIS, a/k/a Baby
Earl, a/k/a E,

*Defendant-Appellant.*

No. 09-4890

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Roger W. Titus, District Judge.
(8:07-cr-00199-RWT-1)

Argued: December 9, 2011

Decided: August 16, 2012

Before AGEE, DAVIS, and KEENAN, Circuit Judges.

---

Affirmed by published opinion. Judge Agee wrote the major-
ity opinion, in which Judge Keenan joined. Judge Davis wrote
a dissenting opinion.

---

## COUNSEL

**ARGUED:** Paresh S. Patel, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.
Deborah A. Johnston, OFFICE OF THE UNITED STATES

ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Emily N. Glatfelter, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

---

**OPINION**

AGEE, Circuit Judge:

A jury convicted Earl Whittley Davis of various federal offenses arising from a course of conduct that included the armed robbery and murder during that robbery of an armored car employee, Jason Schwindler, as well as a subsequent carjacking.[1] On appeal, Davis challenges the use of DNA evidence against him at trial, and also argues that the district court erred in excluding expert testimony proffered by Davis in an attempt to undermine an eyewitness identification of him. For the reasons set forth below, we affirm the judgment of the district court.

I.

All of Davis' convictions arose from the same brief course of events occurring in Prince George's County, Maryland. The district court accurately summarized the facts as follows:

> On August 6, 2004, shortly before 1:00 p.m., Jason Schwindler, an armored car employee, picked up a

---

[1]Specifically, Davis was convicted of Hobbs Act robbery, in violation of 18 U.S.C. § 1951, two counts of possession and discharge of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c), one count of possession and discharge of a firearm in furtherance of a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j), and one count of carjacking, in violation of 18 U.S.C. § 2119.

bank deposit from a local business and took it to a nearby BB&T bank in Hyattsville, Maryland. As Schwindler walked up to the bank entrance, two [gunmen] exited a Jeep Cherokee and began shooting at Schwindler, killing him. When their escape in the Jeep was thwarted by the armored truck driver, the assailants carjacked a bank customer and fled in her vehicle[, a Pontiac Grand Am, which] was later recovered.

*United States v. Davis*, 657 F. Supp. 2d 630, 635 (D. Md. 2009).

After the murder, officers from the Prince George's County Police Department ("PGCPD") responded to the scene and collected numerous items of evidence, including a baseball cap worn by one of the shooters, two firearms, ammunition, and the steering wheel covers from the Jeep Cherokee and the Grand Am. After swabbing and analyzing the items for DNA, the profiles of the major contributors to the DNA found in the ball cap and on the triggers and grips of the recovered firearms were entered into the local Combined DNA Index System ("CODIS") database.[2] A search of the local database led to a "cold hit" between the DNA recovered at the Schwindler murder scene and Davis' DNA profile, which was already present in the local database.

Based on the "cold hit," officers obtained a search warrant to obtain a sample of Davis' DNA directly from him, which again matched the evidence from the Schwindler murder scene. Evidence of this second match was introduced at trial in this case.

---

[2]CODIS is a linked system that allows local, state, and federal forensics laboratories the ability to exchange, share and compare DNA profiles electronically. *See United States v. Mitchell*, 652 F.3d 387, 399 (3d Cir. 2011) (en banc).

Prior to trial, Davis filed a motion to suppress the use of all DNA evidence against him, arguing that his DNA profile had been obtained by police and entered into the local PGCPD DNA database in violation of his Fourth Amendment rights. The district court held an evidentiary hearing, but declined to rule on the motion to suppress immediately, instructing the parties to continue preparing for trial. After a jury found Davis guilty of the charges, the district court issued a lengthy written order denying the motion to suppress. *Davis*, 657 F. Supp. 2d 630-67. Davis was sentenced by the district court on September 18, 2009 to a term of life imprisonment plus 420 months.[3]

Davis noted a timely appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

### *Background and Proceedings Below*

On August 29, 2000, almost four years before the Schwindler murder, Davis arrived at Howard County General Hospital with a gunshot wound to his leg. He claimed to be a robbery victim and reported that he had been shot by the purported robber. Hospital personnel called the police, as Maryland law required, and Patrol Officer Joseph King of the Howard County, Maryland, Police Department ("HCPD") responded to the call.[4] Officer King found Davis lying on a bed in the emergency room. He was conscious, sitting up, and able to converse with Officer King at the time. Davis' pants

---

[3]The death penalty was originally sought in this case, but the district court held that Davis was ineligible for the death penalty because he meets the legal definition for mental retardation. That ruling is not challenged on appeal.

[4]Although the parties and the district court sometimes referred to the two HCPD officers using their titles at the time of the suppression hearing, we use their titles in 2000, as described by them.

and boxer shorts had been removed by hospital personnel and placed in a plastic hospital bag, which was stored on a shelf beneath the bed. Officer King observed Davis' gunshot wound and secured Davis' pants and boxer shorts as evidence of the reported shooting. He did so without express permission from Davis (although Davis saw him take the clothing) and without a warrant. He then gave those items to his colleague, Detective Steven Lampe, who placed them in the HCPD "property room," to be held as evidence in the prosecution of Davis' assailant.

At the suppression hearing, Officer King testified that he could not recall exactly what the bag looked like containing Davis' clothes, and neither could Detective Lampe, except that the bag was "plastic." (J.A. 166.) Officer King testified, however, that he had "responded to the hospital on numerous calls," that he knew it was the hospital's "practice to secure any property" taken from a patient and that the hospital placed that "[c]lothing from a victim . . . under [the patient's] bed." (J.A. 147.) He also testified that he did not need "permission from anyone in the hospital to access" the bag. (J.A. 150.)

No one was ever charged in the August 2000 shooting of Davis, and neither his clothing nor the blood on it were ever tested in connection with that shooting. Davis was not contacted or advised that the shooting investigation was no longer being pursued by the HCPD, nor was he offered the opportunity to retrieve his clothing. Instead, Davis' clothes, containing his DNA material,[5] were simply retained by the HCPD.

In order to give a more complete picture of later events, we note certain additional facts concerning Davis' hospital stay.

---

[5]We use the term "DNA material" to refer to any physical body sample that contains deoxyribonucleic acid (DNA) identification information. *See* 42 U.S.C. § 14135a(c)(2) (defining DNA analysis for purposes of including DNA profiles in CODIS as the "analysis of [DNA] identification information in a bodily sample").

First, although Davis had given a false name and false driver's license upon his admission to the hospital, police later learned his true identity through fingerprinting analysis. Additionally, from the beginning of their questioning of Davis, Officer King and Detective Lampe believed Davis was being uncooperative so they conducted further investigation. That investigation led to the discovery of marijuana in the vehicle in which Davis had arrived at the hospital, as well as several other potentially incriminating items, such as a t-shirt and a ball cap that said "FBI," a handheld radio, leg shackles, gloves, and a mask. As a result, Davis was arrested on drug charges upon his release from the hospital, but those charges were later dropped.

The government does not dispute that Davis' clothing was seized initially because it was evidence of a crime in which he was a victim. The clothing was logged into the HCPD property room, however, on the same sheet with the marijuana found in the car and the false ID card Davis had presented. It also was Davis' arrest record on the drug offense that later led the PGCPD to inquire and learn about the existence of the seized clothing. *Davis*, 657 F. Supp. 2d at 634-35 (noting that in April 2004, Lampe "was contacted by members of [PGCPD], who asked him questions about the arrest of Earl Davis in 2000."). When the clothing was later checked out to the PGCPD for testing in a subsequent murder investigation, however, the form indicated that the clothes and blood were from the victim of a shooting. In effect, then, Davis had a "dual status" throughout the events in this case—he was both victim and arrestee—a fact which becomes important when analyzing his Fourth Amendment claims.

In June 2001, an individual named Michael Neal was murdered in Prince George's County. In April 2004, a PGCPD homicide detective investigating the Neal murder, Detective K. Jernigan, learned that Davis had previously been arrested in Howard County and that the HCPD had Davis' clothes.

The PGCPD suspected Davis was involved in the Neal murder.[6] As a result, they requested and obtained Davis' clothing, without a warrant, from the HCPD.

In June 2004, the PGCPD extracted Davis' DNA from the blood stains on Davis' pants, again without a warrant, and created a DNA profile from the test results. That DNA was compared to an unknown DNA sample recovered from the scene of the Neal homicide, but there was no match. Despite the fact that Davis' DNA profile excluded him as the source of the evidentiary sample from the Neal murder, the PGCPD nonetheless retained his DNA profile, and approximately one week later, included it in their local DNA database.

At a hearing before a Maryland state court in its Schwindler murder prosecution,[7] which is part of the record before us, the DNA analyst for the PGCPD, Julie Kempton, testified concerning the extraction of Davis' profile and its entry into the local database. She testified that she was told by a detective that the boxer shorts were taken "from a suspect, from a hospital emergency room where he had been brought in [she] believe[d] for a shooting[.]" (Supp. J.A. 93.) She further testified that her testing ultimately excluded Davis' profile as a match in the Neal homicide. (Supp. J.A. 93-94.) She also testified that she knew that, at the state level of the CODIS database, a suspect's profile should be deleted if the court ordered

---

[6] The parties are not clear in their briefs and do not point to any record evidence concerning what supported the PGCPD's suspicion that Davis was involved in the Neal murder. Nonetheless, we presume for purposes of this appeal that, whatever level of suspicion it was, it was insufficient to establish probable cause.

[7] Davis was initially charged in Prince George's County Circuit Court and prosecution began there by the Prince George's County State's Attorney's Office. That office later dismissed the case against Davis in coordination with the U.S. Attorney's Office in favor of a federal prosecution. The testimony of the analyst before the Maryland court was attached as Exhibit H to the Government's Consolidated Response to Motions filed before the district court below.

expungement based on a vacated conviction. The record does not disclose any other information as to why the profile was retained, whether that was a common policy or practice, or whether it violated any local rule, regulation, policy, or practice to do so.[8]

As noted earlier, in the course of the investigation of the robbery and murder of Mr. Schwindler, when the DNA profile recovered from the Schwindler crime scene was entered into the PGCPD DNA database, a "cold hit" resulted with the DNA sample that had been lifted from Davis' clothing. The PGCPD then secured a search warrant to obtain a DNA sample directly from Davis. That subsequent DNA profile of Davis also matched the DNA samples from the Schwindler crime scene.

Evidence of the match between the known sample obtained via the search warrant and the crime scene evidence was introduced at Davis' trial. Specifically, DNA analyst Sarah Chenoweth testified that Davis' DNA matched DNA profiles from the baseball cap and both cars' steering wheel covers, and testified as to the infinitesimally small probabilities that the DNA on those items came from any person other than Davis.[9]

Davis moved to suppress the DNA evidence against him, arguing that it was obtained in violation of the Fourth Amendment. In a lengthy order denying suppression, the district court addressed each of Davis' challenges. The court concluded that Davis' Fourth Amendment rights were violated only when his DNA profile was retained in the local DNA database, after Davis' profile did not match the DNA sample from the Neal murder, but found no other violations. As to the retention of Davis' profile, the court concluded that the "good

---

[8]Although not in evidence, there was a limited discussion at oral argument regarding what the common policy or practice was at that time. *See infra* at 48-49.

[9]The accuracy of the DNA match is uncontested on appeal.

faith" exception should be applied and thus the application of the exclusionary rule was not warranted.

## III.

### *Davis' Challenge to the DNA Evidence*

Davis alleges three separate Fourth Amendment violations regarding the collection and retention of his DNA. Specifically, Davis asserts that each of the following actions by police constituted a Fourth Amendment violation: (1) the seizure of his clothing from the hospital room and its subsequent search; (2) the extraction of his DNA profile and testing in connection with the Neal murder investigation; and (3) the retention of his DNA profile in the local DNA database.[10]

For the reasons discussed below, we agree with the district court that no Fourth Amendment violation occurred in the seizure of the bag containing Davis' clothing at the hospital. We also agree that any subsequent "search" of the bag was not unlawful because its contents were a foregone conclusion, based in part on Officer King's uncontradicted testimony that he saw "a bag underneath of [Davis'] hospital bed that contained clothing."[11] We further determine that there was a

---

[10]Before the district court, Davis' counsel argued six different points in which the Fourth Amendment could be implicated. On appeal, he limits his Fourth Amendment challenges to the three recited.

[11]Relying on *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997), the dissent criticizes the majority opinion for its alleged failure to recognize that the plain view doctrine can justify a seizure, but not a warrantless search. *See generally post* at 70-72.

We recognize and acknowledge, as explained in *Jackson*, that the plain view doctrine is not an exception to the warrant requirement for a Fourth Amendment search. 131 F.3d at 1108. Rather, the proper analysis is that there was a "non-search" here—for Fourth Amendment purposes—because no privacy interests were implicated. That is so because the police were justified in "searching" the bag of Davis' clothing because it was a foregone conclusion that the bag contained evidence of a crime;

Fourth Amendment violation when the PGCPD extracted Davis' DNA profile from his clothing and tested it as part of the Neal murder investigation. We assume, without deciding, that there was a separate Fourth Amendment violation in retaining Davis' DNA profile in the local CODIS database. Finally, we conclude that the "good faith exception" to the exclusionary rule applies here to both violations and thus the DNA evidence was not required to be excluded.

We review the factual findings underlying a motion to suppress for clear error and the district court's legal determinations de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir. 1992). When a suppression motion has been denied, this Court reviews the evidence in the light most favorable to the government. *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998).

A.

*The Seizure of Davis' Clothing in His Hospital Room*

Davis first argues that the seizure of his clothing from his hospital room constituted a warrantless seizure that was not justified by any exception to the warrant requirement. The government contends that both the seizure and the subsequent

---

just as in *United States v. Williams*, upon which we rely, the police lawfully searched a seized container because it was a foregone conclusion it contained evidence of a crime. 41 F.3d 192, 198 (4th Cir. 1994). We describe the action of the police in either looking in the bag or cataloguing its contents as a "search," as that term is used in the non-technical sense, since that is the framework utilized by the parties, by the dissent, and by the court in *Williams*. *See id.* ("When a container has been legally seized, and its contents are a foregone conclusion, we hold that a subsequent search of the container is lawful under the plain view container doctrine."). To the extent there is an issue, it is more of labeling than of substance.

search of the bag containing the clothing were justified by the "plain view" exception, as the district court concluded.[12]

For the plain view exception to the warrant rule to apply, the government must show that: (1) the officer was lawfully in a place from which the object could be viewed; (2) the officer had a "lawful right of access" to the seized items; and (3) the incriminating character of the items was immediately apparent. *See United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997). Davis concedes that Officer King was lawfully in the hospital room and thus that the government has satisfied the first requirement, but argues that the government failed to satisfy the latter two requirements. We disagree.

As to the second requirement, Davis contends that, even though Officer King was in the room lawfully, he did not have lawful access to the bag of clothing. The case most heavily relied upon by Davis, *United States v. Neely*, 345 F.3d 366 (5th Cir. 2003), is inapposite. In *Neely*, the Fifth Circuit held the plain view doctrine did not allow the seizure of the patient's clothing, because the clothing at issue was not in open view but in the hospital property storage room, and required permission from hospital personnel to retrieve it. *Id.* at 368, 371. Notably, the hospital patient in *Neely* was the suspect in a criminal investigation, not the victim of a crime like Davis. *Id.* at 367-68.

*Neely* aside, we have no difficulty finding that there was lawful access to the clothing here. As suggested in *Horton v. California*, 496 U.S. 128 (1990), the lawful access requirement is intended to clarify that police may not enter a prem-

---

[12]The government also contends that, even if the plain view exception did not apply, the clothing and DNA on it are not subject to exclusion because those items would have been discovered and seized upon Davis' arrest for narcotics violations as he left the hospital. The district court rejected this argument. *Davis*, 657 F. Supp. 2d at 641. In light of our ruling that the plain view exception applies, we do not address the alternative argument of the government.

ises to make a warrantless seizure, even if they could otherwise see (from a lawful vantage point) that there was contraband in plain sight. *Id.* at 137 & n.7 (describing the second requirement and explaining that even if "[i]ncontrovertable testimony of the senses" establishes that an object in plain view is contraband, "the police may not enter and make a warrantless seizure"); *see also Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) (the "lawful right of access" requirement "is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances"; thus, while "lawfully positioned" "refers to where the officer stands when she sees the item," "lawful right of access" refers "to where she must be to retrieve the item"). The example given by the government in this case is apt, *i.e.*, the analysis of the first and second prongs might be different if "the officer were lawfully present outside a building, peering through a window into a room in which he would not be lawfully present." (Appellee's Br. 32 n.8.) Here, however, there is no dispute that Officer King was lawfully present in the hospital room, and he thus had lawful access in the ordinary course of his investigation to the bag of clothing which could be evidence against Davis' assailant.[13] *See Washington v. Chrisman*, 455 U.S. 1, 8 (1982) ("when a police officer, for unrelated but entirely legitimate reasons, obtains lawful access to an individual's area of privacy . . . [,] the Fourth Amendment does not prohibit seizure of evidence of criminal conduct found in these circumstances."); *see also infra* at 17-18 (discussing

---

[13]The dissent devotes considerable ink to disputing the lawful access prong, complete with hypotheticals unrelated to the situation in the case at bar. *See post* at 65-70 and corresponding notes. Context matters, however, and the context of this case is that of a police officer who was lawfully fulfilling his duty to investigate a reported shooting. In doing so, he lawfully entered the emergency room of a hospital to interview the victim of the shooting, and observed both the victim, unclothed from the waist down, lying on a gurney with a visible gunshot wound to his upper thigh, and a plastic bag of clothing underneath the victim's gurney. That context informs our conclusion that the officer had lawful access to the bag.

cases permitting seizure of blood-stained clothing in plain view).

The third prong of the plain view doctrine is less readily resolved. Nonetheless, having carefully reviewed the district court's ruling on this point, we find no clear error in its factual findings, nor any error in its legal conclusions.

Davis' primary argument is that while the bag may have been in plain view, the clothes were not. Thus, he contends that both the seizure and any subsequent search of the bag violated his constitutional rights. The seizure implicated Davis' possessory interest in his clothing, and any subsequent search implicated his privacy interest. *See Texas v. Brown*, 460 U.S. 730, 747 (1983) (Stevens, J., concurring in the judgment). As Davis' arguments on this issue acknowledge, under the facts here, the two concepts overlap. Specifically, the seizure of the bag was warranted under the plain view exception only if it was immediately apparent that it contained incriminating evidence. Here, that would require it be immediately apparent that the bag contained evidence of a crime, *i.e.*, Davis' clothing possessing blood, trace evidence, and/or a bullet hole. Similarly, the subsequent search of the bag (whether to identify or examine its contents), was warranted if it was a foregone conclusion that the bag contained the clothing, which was evidence of a crime.

As to both the seizure of the bag and any subsequent search of the bag, the district court's reliance on *United States v. Williams*, 41 F.3d 192 (4th Cir. 1994) was appropriate. In *Williams*, officers had properly seized five packages, which consisted of a brown, opaque material wrapped in heavy cellophane. *Id.* at 197-98. The defendant challenged the subsequent warrantless search, in which a police officer removed the cellophane wrapping from one of the packages, poked a hole in the opaque material surrounding its contents, removed a small quantity of white powder and field tested the powder, which tested positive for cocaine. *Id.* at 194.

The *Williams* Court explained that a search of such a container is permissible under the plain view doctrine when "the contents of a seized container are a foregone conclusion." *Id.* at 197. That is, "when a container is not closed, or transparent, or when its distinctive configuration proclaims its contents, the container supports no reasonable expectation of privacy and the contents can be said to be in plain view." *Id.* (citations omitted). *Williams* clearly stated that, "[i]n determining whether the contents of a container are a foregone conclusion, the circumstances under which an officer finds the container may add to the apparent nature of its contents." *Id.* (citing *Blair v. United States*, 665 F.2d 500, 507 (4th Cir. 1981)).

*Williams* also quite plainly allows the experience of the officer to be taken into account when determining whether a container's contents are a "foregone conclusion." *Id.* at 198. There, the Court relied on the testimony of the police officer that, based on his ten years of experience, packages wrapped in this manner contained narcotics, to support the Court's holding that the contents of the container were a "foregone conclusion." *Id.* at 194, 198. The Court also noted that the other items found in the suitcase with the wrapped packages (towels, dirty blankets, and a shirt with a cigarette burn) were unusual for a traveler, in that they did not contain clothing or other items a person normally carries when traveling across the country. *Id.* Thus, in conducting this inquiry, we consider both the circumstances under which the container here was found and Officer King's knowledge about this particular hospital's practices and procedures and his experience in responding to the hospital bedsides of gunshot victims in this particular hospital.[14]

---

[14]While the dissent appears to disagree with the holding of *Williams* in some respects, *see post* at 74-75 n.13, 83, we are bound to follow our own Circuit's precedent "absent contrary law from an *en banc* decision of this Court or a Supreme Court decision." *United States v. Jeffery*, 631 F.3d 669, 677 (4th Cir. 2011).

Here, Officer King testified, without contradiction or chal-
lenge, that when he entered the curtained-off area where he
was told Davis would be, he saw Davis on a hospital bed and
observed "a bag underneath of the hospital bed that contained
clothing." (J.A. 140.) He did not testify that he walked into
the area and saw what he *thought* might be a bag of clothing
under the bed. Drawing the inferences from the facts in the
government's favor, as we must, *see Seidman*, 156 F.3d at
547, that testimony fairly supports an inference that Officer
King could see the clothing through the bag or that the bag
was partially open, revealing clothing. Nothing in the record
contradicts such a conclusion. Because the officers were not
asked whether the bag was open or closed and could not recall
precisely what the bag looked like, however, we do not know
for certain "whether the bag was open or closed, or whether
it was transparent, opaque or somewhere in-between," *Davis*,
657 F. Supp. 2d at 638.[15] What is clear from this record is that
Officer King expressed no doubt he observed "a bag . . . that
contained clothing." (J.A. 140.) Thus, we disagree with the
dissent's contention that Officer King's testimony was equiv-
ocal, or that his testimony fails to rise to the level of certainty
required in *Williams*. *See post* at 82-83.[16]

Officer King also testified that it was the practice and pro-
cedure of the hospital to place a patient's clothing in a bag on

---

[15]It is unsurprising that neither officer could remember, at the time of
their testimony at the suppression hearing in September 2008, precisely
what the plastic bag looked like given that they had seen it briefly more
than eight years earlier, in August 2000.

[16]Contrary to the dissent's unfounded claim that we are engaging in "ex-
traordinary appellate fact-finding," *post* at 74 n.12, we are simply quoting
from the undisputed testimony of Officer King in the record. While the
government bears the burden of proof to show that the warrantless seizure
was justified, the district court ruled in the government's favor and thus
any inferences to be drawn from the testimony are to be viewed in the
light most favorable to the government. *Seidman*, 156 F.3d at 547. More-
over, nowhere in its brief does the government "concede" that King did
not know it was clothing in the bag. *Cf. post* at 73 n.12.

the shelf under his bed. He further could visibly see that Davis had been shot in his upper right thigh, and that Davis was no longer wearing pants or underwear. Instead, while Davis was wearing clothing on his upper body, his lower body was exposed, except for his genital area, which was covered by a sheet. (*See* Supp. J.A. 73 (picture of Davis in hospital bed); J.A. 141 (testimony of Officer King that picture accurately depicted what Davis was wearing)).

We agree with the district court that "the totality of the circumstances, taking into account [Officer] King's experience with the hospital's practices regarding patients' property, the appearance of the Defendant at the time [Officer] King spoke with him, and the obvious fact that the Defendant had been shot in an area of the body usually covered by clothing" support the determination that it was a foregone conclusion the bag under Davis' hospital bed contained the clothing he wore when he was shot.

Davis alternatively contends that even if it had been a virtual certainty that the bag contained Davis' clothing, the incriminating nature of those clothes was not "immediately apparent." We have little trouble, however, in concluding that Davis' pants almost certainly would contain both blood and a bullet hole,[17] and would thus be incriminating evidence in

---

[17]The dissent's lengthy discussion of *United States v. Jamison*, 509 F.3d 623 (4th Cir. 2007), *see post* at 78-80 & n.15, to suggest that a bullet hole might not have been present in Davis' pants, is unavailing. *Jamison* did not involve any challenge to the search or seizure of evidence; the issue there was whether the defendant was in custody for *Miranda* purposes at the time police questioned him. Moreover, the fact that it was theoretically possible, at the time that Officer King seized the clothing, that Davis was: a) lying about being shot by someone else and had instead shot himself; and b) done so in a manner that somehow avoided putting a hole in his own pants, does not alter our conclusion. As the Tenth Circuit has explained, the knowledge required to establish a "foregone conclusion" is not absolute certainty, but "knowledge *approaching* certainty." *United States v. Jackson*, 381 F.3d 984, 989 n.2 (10th Cir. 2004) (emphasis in original). That standard is met here.

the prosecution of the shooter. Such a conclusion is based on the circumstances, Davis' appearance, and the location of his bullet wound. As noted by the district court, moreover, Davis has provided no authority to support imposing a requirement that the evidence be incriminating against the person from whom it is seized. *Davis*, 657 F. Supp. 2d at 640. As the district court reasoned:

> [The defendant's failure to provide any authority] may be due to the unique situation presented by the facts of this case; very rarely will a victim from whom evidence is seized later become a criminal defendant with standing and reason to challenge the previous seizure. As a matter of first impression, however, it would seem unwise and overly restrictive to require police to know who will be incriminated by an item in plain view before they are able to seize it and investigate further.

*Id.*

Indeed, Supreme Court cases and authority from other circuits explain that an item need not itself be contraband before it has an "incriminating nature," but instead, an item need only be evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 742 (1983) (Rehnquist, J., plurality opinion) (discussing plain view doctrine and whether items may be "contraband or stolen property or *useful as evidence of a crime*") (emphasis added); *United States v. Smith*, 459 F.3d 1276, 1293 (11th Cir. 2006) ("the scope of the 'plain view' doctrine extends to the seizure of items that, while not contraband themselves, may be used as evidence against a defendant"); *United States v. Rodriguez*, 601 F.3d 402, 407 (5th Cir. 2010) ("The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either *evidence of a crime* or contraband.") (emphasis added and citation omitted); *United States v. Chipps*, 410 F.3d 438, 443 (8th Cir. 2005) (warrantless seizure of a sweatshirt on the

ground outside a house where there had been a reported assault was justified by the plain view doctrine, since "the incriminating nature of a bloody sweatshirt at the site of a potential assault was obvious" and the officer "had a legal right to access the shirt—it was right in front of him on the ground"); *Chavis v. Wainwright*, 488 F.2d 1077, 1078 (5th Cir. 1973) (clothing in plastic hospital bag was properly seized from stabbing victim in hospital without a warrant as evidence of an assault, despite fact that victim told police he did not want to prosecute his assailant girlfriend).[18] Here, like the bloody clothing in *Chipps* and in *Chavis*, the pants with a bullet hole, which would be clear evidence a shooting occurred and might reasonably provide scientific evidence related to the gun caliber, distance, etc., is evidence of a crime and hence, has an immediately apparent "incriminating nature."[19]

---

[18]The Fifth Circuit reasoned in *Chavis* that "[c]learly, the officer . . . would have been derelict in his duty had he not taken custody of Chavis' clothing as evidence of a possible homicide that he was investigating." 488 F.2d at 1078; *see also Jamison*, 509 F.3d at 631-32 (in context of addressing interrogation and gun-powder residue testing of a hospital patient who was admitted with a gunshot wound, noting that a reasonable person who is admitted to a hospital with a gunshot wound and reports that he was shot by someone else would expect to be interviewed and "might complain of police malfeasance had [the police] *not* immediately investigated the shooting[,] [since a] reasonable person would tolerate nothing less than a thorough investigation into such a shooting").

[19]The dissent cites *Clay v. State*, 725 S.E.2d 260 (Ga. 2012), as a case in which a court concluded the plain view exception did not warrant the search of a bag of clothing. *See post* at 81 n.16. Contrary to the dissent's description of *Clay* as having "nearly identical" facts, however, the defendant in *Clay* was an unconscious murder *suspect* at the time the police reported to the hospital and conducted a search of the bag containing his personal effects. *See* 725 S.E.2d at 264-65. Significantly, there was no evidence in that case that the police knew there would be blood on his clothing or other evidence of any crime. Unlike Davis, the suspect had not been shot or assaulted and was not being treated for any wounds, nor were any wounds visible, that would indicate there would be blood on his clothing. *Id.* Under these circumstances, the court concluded that it was not a "'fore-

For all of the foregoing reasons, we conclude that the plain view doctrine justified both the warrantless seizure and the subsequent search of the bag containing the clothing under Davis' hospital bed.

---

gone conclusion' that the bag contained [the suspect's] bloody clothes." *Id.* at 269. Here, by contrast, there was ample evidence in plain sight (including most notably the gunshot wound on Davis' upper thigh) from which Officer King could conclude it was a foregone conclusion that the bag contained Davis' clothing, and that the clothing contained evidence of a crime.

Moreover, while Davis and the dissent cite to decisions of other courts for the "unremarkable proposition" that hospital patients retain a reasonable expectation of privacy in their clothing, *see post* at 81 n.16, that proposition is far from universally accepted. Indeed, other courts have found that a reasonable expectation of privacy was lacking under facts similar to those here and thus upheld the warrantless seizure and search of clothing belonging to a hospital patient. *See, e.g.*, *Mitchell v. State*, 906 S.W.2d 307, 309 (Ark. 1995) (affirming warrantless seizure of clothing from hospital and subsequent inventory search, explaining that "[t]he totality of the circumstances herein includes the fact that the appellant was thought to be a victim [and] [t]he clothing of a gunshot victim is evidence of the commission of a crime"); *Holt v. United States*, 675 A.2d 474, 477, 480 (D.C. 1996) (Fourth Amendment was not violated by the search or the subsequent seizure of defendant's clothing from a "visible, unsealed plastic bag under [defendant's] gurney in which hospital personnel had stored [his] clothing before treating him" after defendant had admitted himself with a gunshot wound, particularly where he had "voluntarily walked into [the hospital] emergency room wearing—for everyone to see—the clothing the police later inspected" and he never expressed "a desire to remove [the clothing] from public view"); *People v. Sutherland*, 415 N.E.2d 1267, 1271 (Ill. App. Ct. 1980) (gunshot victim whose clothes were removed at the hospital had no reasonable expectation of privacy in those clothes and thus they could be obtained and inspected without a warrant); *State v. Adams*, 541 A.2d 262, 265 (N.J. Super. Ct. App. Div. 1988) (exigent circumstances permitted the search and inspection of clothing taken from an unconscious hospital patient in the emergency room, who was believed to be the victim of a shooting); *Wagner v. Hedrick*, 383 S.E.2d 286, 291 (W. Va. 1989) (motorcycle accident victim had no "reasonable expectation of privacy in his personal effects" under the control of emergency room staff).

Before turning to the issues surrounding the extraction and testing of Davis' DNA, we respond briefly to two points raised by the dissent regarding the seizure and search of the clothing and our application of *Williams*. First, the dissent argues *Williams* is distinguishable on the grounds that the district court here considered *only* extrinsic evidence, while the *Williams* court considered such extrinsic evidence in addition to the physical appearance and character of the container. Relatedly, the dissent further states, without citation to authority, that "[n]arcotics packaging is so readily recognizable as to rise to the level of the archetypal kit of burglar tools or a gun case," while the bag here was not "distinctive in any way." *Post* at 82, 83. We disagree.

The dissent's assertions that drug packaging is "readily recognizable" as such while a bag containing a hospital patient's clothing is not, is true only if the contextual evidence present in *Williams* is being taken into account, *i.e.*, the fact that the packaging was in a suitcase with very few other items one would suspect to find in a traveler's luggage, and the contextual evidence here is ignored, *i.e.*, that the bag was underneath a gunshot victim's hospital bed. But *Williams* expressly permits us to consider the context and circumstances of the specific case, as well as the experience of the officer. Here, those factors compel the conclusion that the bag under Davis' bed contained his clothing.[20]

Second, the dissent suggests an inconsistency between our

---

[20]Indeed, in gauging what is "readily recognizable," we think it likely that the vast majority of people who have spent time in a hospital (either as a patient or with a friend or family member) know that hospitals commonly place a patient's clothing in a plastic bag that either stays in his room or travels with him on his bed or gurney. On the other hand, most lay people do not have personal experience with the types of packaging used by drug traffickers. Regardless of which container hypothetically is more recognizable in the absence of context and personal experience, we readily conclude that the bag here was readily identifiable as containing Davis' clothing.

upholding the seizure of Davis' clothing at the hospital (which obviously contained his DNA), but concluding that he had a reasonable expectation of privacy in his DNA such that its later use violated his Fourth Amendment rights. *See post* at 84-85 (it is "curious, to say the least, to reason as does the majority that Davis retained, for several years after the bag was seized at the hospital, a reasonable expectation of privacy in the character of his DNA molecules, but that he lacked any reasonable expectation of privacy in the presence of those molecules in his blood while they were embedded in his clothing" while at the hospital). This perceived inconsistency is based on a misunderstanding of our holding.

We do not hold that Davis had no expectation of privacy in his DNA while it was on his clothing at the hospital. What we conclude is that the seizure and search of the bag containing Davis' clothing were permitted under the plain view doctrine because his clothing was evidence of a crime and was in plain view, as applied in *Williams*. *See infra* at 29 ("while Davis may not have had any expectation of privacy in the outward appearance of the clothing once it was in police custody, we nevertheless must consider . . . whether Davis retained a reasonable expectation of privacy in his DNA on the clothing or in the DNA profile obtained from it.")

Davis always had an expectation of privacy in his DNA, but that expectation of privacy was not implicated merely by an effort to identify, describe and catalogue his clothing as evidence of a reported crime, rather than testing anything found on it. It was not until the police sought to obtain a DNA profile from his blood that his privacy interest in his DNA was implicated. As we explain, the search of his DNA did not occur until the police extracted and tested his DNA in conjunction with the Neal murder. *See infra* at Section III.B.2. The dissent's perceived "inconsistency" in our holdings does not exist.[21]

---

[21]Because DNA is found in many bodily substances, *see Kaemmerling v. Lappin*, 553 F.3d 669, 682 (D.C. Cir. 2008) ("DNA exists in numerous

B.

*The Extraction and Testing of Davis' DNA Profile for Use
in the Neal Murder Investigation, and the Retention of
Davis' DNA Profile*

Having concluded that the HCPD lawfully obtained the clothing that contained Davis' DNA material, we now turn to Davis' contention that the PGCPD violated the Fourth Amendment by extracting his DNA from the blood on that clothing and testing it for use in the Neal murder investigation, as well as in retaining his profile in their local DNA database.

1.

*General Fourth Amendment Principles*

The general issue of a person's reasonable expectation of privacy in his DNA is a developing and unsettled area of the law, one that has not yet been addressed by the Supreme Court. The relative recency of the technology, especially when coupled with its potential power, is no doubt part of the reason why there is uncertainty over the degree of privacy persons can reasonably expect to have in their DNA. *Cf. Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 129 S. Ct. 2308, 2316 (2009) ("Modern DNA testing can provide powerful new evidence unlike anything known

_____

parts of the body that even nonviolent criminals leave behind, including hair, saliva, and skin cells . . . .") (citation omitted), the mere fact that DNA material is present on a physical item of seized evidence cannot automatically infringe upon a person's privacy interest in his or her DNA. It is not until the DNA is tested and extracted and a DNA profile created that the privacy interest in DNA might be implicated. Put differently, it cannot be the rule that an otherwise lawful seizure of physical evidence becomes illegal merely because a non-perpetrator's DNA may be on that evidence.

before . . . DNA testing has exonerated wrongly convicted people, and has confirmed the convictions of many others."); *Jones v. Murray*, 962 F.2d 302, 307 (4th Cir. 1992) (describing DNA as a "dramatic new tool for the law enforcement effort to match suspects and criminal conduct").[22]

---

[22] In *Jones*, in the context of obtaining DNA profiles from incarcerated felons, we analogized DNA profiling to fingerprinting, *i.e.*, a more sophisticated or refined means of identification. 962 F.2d at 306-07; *see also Mitchell*, 652 F.3d at 413 ("at present DNA profiling is simply a more precise method of ascertaining identity and is thus akin to fingerprinting, which has long been accepted as part of routine booking procedures"); *see also United States v. Amerson*, 483 F.3d 73, 85-86 (2d Cir. 2007) ("at least in the current state of scientific knowledge, the DNA profile derived from the offender's blood sample establishes only a record of the offender's identity" and "a probationer's expectation of privacy in his or her identity is severely diminished."); *Boroian v. Mueller*, 616 F.3d 60, 66-67 (1st Cir. 2010) ("Given the [federal] DNA Act's stringent limitations on the creation and use of DNA profiles, CODIS currently functions much like a traditional fingerprint database" and citing to cases from the Second, Tenth, and District of Columbia Circuits so stating). However, courts also have recognized the limitations of this analogy, which stem from the fact that a DNA profile, unlike a fingerprint, is drawn from DNA that stores a wealth of personal information. *See Johnson v. Quander*, 440 F.3d 489, 499 (D.C. Cir. 2006) ("genetic fingerprints differ somewhat from their metacarpal brethren"); *United States v. Kincade*, 379 F.3d 813, 841-42 & n.3 (9th Cir. 2004) (en banc) (Gould, J., concurring) ("Like DNA, a fingerprint identifies a person, but unlike DNA, a fingerprint says nothing about the person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct.").

In any event, both a thorough examination of the science of DNA profiling, as well as the operation and interplay of local, state, and federal DNA law enforcement databases, are far beyond the scope of this opinion. Other courts have examined these issues in detail and we will not do so here. *See, e.g.*, *Mitchell*, 652 F.3d at 398-402 (discussing the process of creating a DNA profile for CODIS and the use of "junk" DNA, the federal DNA act and the levels of database that contribute to CODIS); *Boroian*, 616 F.3d at 63-64, 65-67 (explaining how DNA samples are obtained, summarizing the provisions of the federal DNA act, and describing how CODIS works and how the database has grown and expanded since its initial development).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. However, the protections of the Fourth Amendment are activated only when the state conducts a search or seizure in an area in which there is a "constitutionally protected reasonable expectation of privacy." *New York v. Class*, 475 U.S. 106, 112 (1986) (citation omitted). When there is no reasonable expectation of privacy, the Fourth Amendment is not implicated.[23] *See, e.g.*, *United States v. Dionisio*, 410 U.S. 1, 14 (1973) (no reasonable expectation of privacy in one's voice); *United States v. Mara*, 410 U.S. 19, 21 (1973) (no reasonable expectation of privacy in one's handwriting); *California v. Greenwood*, 486 U.S. 35, 37 (1988) (same as to trash left by the curb). A search or sei-

---

[23]The Supreme Court's recent decision in *United States v. Jones*, 132 S. Ct. 945 (Jan. 23, 2012) does not change our analysis in this case. In *Jones*, the Court held that the Fourth Amendment was violated when law enforcement officers, without a valid warrant, installed a GPS tracking device on the undercarriage of the defendant's Jeep while it was parked in a public parking lot. In determining whether this action constituted a "search," the majority did not reach the issue of whether the Defendant had a "reasonable expectation of privacy" in the underbody of the Jeep. *Id.* at 950. Instead, its conclusion rested entirely on the fact that the "Government physically occupied private property for the purpose of obtaining information," *id.* at 949, and that constituted a violation of the Fourth Amendment right "to be secure against unreasonable searches and seizures in their persons, houses, papers and effects." *Id.* In so holding, the Court emphasized that *Katz* simply established that "property rights are not the sole measure of Fourth Amendment violations," but that *Katz* did not extinguish the "previously recognized protection for property." *Id.* at 951; *see also id.* at 954-55 (Sotomayor, J., concurring). In the case at bar, once the police had lawful possession of Davis' clothing, there was no further intrusion of, or trespass upon, his property rights. Thus, the only basis on which the later testing of the clothing could constitute a search is if Davis retained a reasonable expectation of privacy in his clothing or the blood on it.

zure for Fourth Amendment purposes does not occur, therefore, when a person lacks a reasonable expectation of privacy in the material examined. *United States v. Breza*, 308 F.3d 430, 433 (4th Cir. 2002) (citing *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)).

Even if a search has occurred without a warrant and without individualized suspicion, a Fourth Amendment violation does not necessarily occur. The Fourth Amendment does not prohibit all searches, only those that are unreasonable. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989) ("the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable"); *Terry v. Ohio*, 392 U.S. 1, 9 (1968) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.") (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)). And "[a]lthough as a general matter, warrantless searches 'are *per se* unreasonable under the Fourth Amendment,' there are 'a few specifically established and well-delineated exceptions' to that general rule." *City of Ontario, Ca. v. Quon*, 130 S. Ct. 2619, 2630 (2010) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989) ("neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance").

### 2.

*Whether Extraction and Testing of Davis' DNA Profile for Use in the Neal Murder Investigation, or its Later Retention, Constituted Searches?*

We first consider the threshold question whether a search occurred when the PGCPD extracted and tested Davis' DNA for use in the Neal murder investigation, or when the PGCPD retained Davis' DNA profile in CODIS. Our analysis turns on the question whether Davis had a reasonable expectation of

privacy in his clothing and the blood and DNA it contained, once it was in the lawful custody of the HCPD.

The government argues that there was no search or seizure here, relying primarily on *United States v. Edwards*, 415 U.S. 800 (1974), for the proposition that Davis lacked any reasonable expectation of privacy in his clothes or DNA after they were lawfully seized by police.[24] In *Edwards*, the defendant was arrested and charged with an attempted break-in at approximately 11:00 p.m., taken to the local jail and placed in a cell. 415 U.S. at 801. Investigation at the scene revealed that the attempted entry had been made through a wooden window and that paint chips had been left on the window sill and wire mesh. *Id.* at 801-02. The next morning (approximately ten hours after his arrest), Edwards was given a change of clothing and his clothing was then taken from him and held as evidence. *Id.* at 802. Examination of the clothing revealed paint chips matching the samples taken from the window. *Id.* The evidence of the matching paint chips was later introduced at trial, over Edwards' objection. *Id.* The Sixth Circuit reversed, finding the seizure of the clothing, carried out after "the mechanics of [Edwards'] arrest" had been completed, violated the Fourth Amendment. *Id.*

---

[24]The government also relies on *United States v. Gargotto*, 476 F.2d 1009 (6th Cir. 1973) and *Wallace v. State*, 816 A.2d 883 (Md. 2003). In *Gargotto*, the Sixth Circuit held that a defendant's records seized in a state investigation could be given to federal authorities without a separate search warrant, and used as evidence in an unrelated federal case. 476 F.2d at 1014. Similarly, *Wallace* affirmed the warrantless search and visual inspection of the defendant's clothing in conjunction with a murder charge, where the clothing had been initially seized during an inventory search upon his arrest for drug charges, because the defendant had no reasonable expectation of privacy in that clothing. 816 A.2d at 897, 901. The district court considered *Wallace* and other similar cases, but found them all distinguishable on the grounds that the evidence in the other cases lawfully entered police custody pursuant to a defendant's arrest or was seized pursuant to a warrant supported by probable cause. *Davis*, 657 F. Supp. 2d at 646. By contrast, Davis' pants with the bloodstain were in lawful police custody as evidence of a crime in which he was the reported victim. *Id.* at 647.

The Supreme Court reversed the Sixth Circuit, holding that the warrantless seizure of the clothing was constitutional. The Supreme Court first noted that warrantless searches are permitted incident to custodial arrests, and that they can legally be conducted later when the accused arrives at the place of detention. *Id.* at 802-03. "Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial." *Id.* at 803-04.

The government reads *Edwards* to stand for the proposition that once the police have lawful custody of evidence, like Davis' clothing here, further scientific examination conducted on it by that particular police department or by any other law enforcement body does not first require that a search warrant be obtained. (*See* Appellee's Br. 46.) As a result, the government argues, Davis did not have a reasonable expectation of privacy in the DNA contained in his clothing because it had been lawfully seized by the HCPD. The government accordingly contends that the PGCPD did not violate the Fourth Amendment when the PGCPD later obtained Davis' clothing and extracted the DNA at issue.

The Court in *Edwards*, however, did not adopt the categorical rule advanced by the government:

> In upholding this search and seizure, *we do not conclude that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee*. But we do think that the Court of Appeals for the First Circuit captured the essence of situations like this when it said in *United States v. DeLeo*, 422 F.2d 487, 493 (1970) (footnote omitted): "While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of

> protection from police interest in weapons, means of escape, and *evidence*."

415 U.S. at 808-09 (footnote omitted and emphasis added); *id.* at 808 n.9 ("Holding the Warrant Clause inapplicable in the circumstances present here does not leave law enforcement officials subject to no restraints. This type of police conduct must still be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.") (internal quotation marks and alteration omitted).

In *Edwards*, the class of person whose item was seized, an arrestee, and the type of item seized, evidence, were material considerations in the Court's analysis. Further, *Edwards* recognized that even an arrestee, who has a diminished expectation of privacy, does not forfeit forever all privacy interests in his effects. Therefore, the *Edwards* decision itself does not support the government's broad categorical assertion that any item in the lawful custody of law enforcement can be subjected to laboratory analysis at any later time and for any purpose related to law enforcement.

Moreover, because the analysis of biological samples, such as those derived from blood, urine, or other bodily fluids, can reveal "physiological data" and a "host of private medical facts," such analyses may "intrude[ ] upon expectations of privacy that society has long recognized as reasonable." *Skinner*, 489 U.S. at 616-17. Therefore, such analyses often qualify as a search under the Fourth Amendment. *Id.* at 618 (concluding that "the collection and subsequent analysis of the requisite biological [blood and urine] samples must be deemed Fourth Amendment searches"). Similarly, an analysis required to obtain a DNA profile, like the chemical analysis of blood and urine at issue in *Skinner*, generally qualifies as a search, because an individual retains a legitimate expectation of privacy in the information obtained from the testing. *See, e.g.*, *United States v. Mitchell*, 652 F.3d 387, 407 (3d Cir. 2011) (en banc) (after discussing the Fourth Amendment search that

occurs when a DNA sample is collected directly from a person's body, discussing separately "[t]he second 'search' at issue," which was, "of course, the processing of the DNA sample and creation of the DNA profile for CODIS. This search also has the potential to infringe upon privacy interests.").

By contrast, in *Edwards*, the analysis at issue examined paint chips found in the defendant's clothing, which did not implicate the privacy concerns inherent in the use of physiological and medical information obtained from DNA analysis that was addressed in *Skinner*. *See Edwards*, 415 U.S. at 801-02. Thus, in the present case, while Davis may not have had any expectation of privacy in the outward appearance of the clothing once it was in police custody, we nevertheless must consider the type of analysis conducted on that clothing to determine whether Davis retained a reasonable expectation of privacy in his DNA on the clothing, or in the DNA profile obtained from it.

The district court concluded that *Edwards* is inapplicable here because, unlike the defendant's clothing in Edwards, Davis' clothing was not seized pursuant to his arrest on the drug charges, but was seized before his arrest when his status was that of a reported crime victim. As noted by the district court, to allow the testing and retention of DNA profiles from any evidence lawfully obtained by police could expose a victim of a crime whose blood, or other material from which DNA could be obtained, to having his or her DNA extracted and retained indefinitely in a law enforcement database. The district court reasoned:

> Taken to its logical extreme, the application of *Edwards* and its progeny to the instant case would mean that any citizen whose blood finds its way into lawful police custody as a result of victimization (e.g., child abuse, sexual assault and domestic violence victims, etc.), would then lose any expectation

of privacy in the DNA markers in that blood, which could be used against him or her at a later date without the constitutional safeguard that a warrant supported by probable cause first be issued.

*Id.* at 647. It was on this basis, the distinction between the DNA of a victim and an arrestee, that the district court found *Edwards* inapplicable.

Although we are not faced here with the full range of potential problems identified by the district court, we agree with the district court that a person who is solely a crime victim does not lose all reasonable expectation of privacy in his or her DNA material simply because it has come into the lawful possession of the police. And, although Davis later was arrested, because the police seized his clothing when he was solely a crime victim, we conclude that his later arrest does not eradicate his expectation of privacy in his DNA material.

Our conclusion that Davis' status as a victim materially distinguishes the present case from *Edwards* is supported by our precedent and by decisions of our sister circuits. These decisions, in addressing whether, and under what circumstances, the Constitution allows the collection of DNA samples, uniformly recognize that persons who have not been arrested have a greater privacy interest in their DNA than would persons who have been arrested, such as the arrestee in *Edwards*.

First, our decision in *Jones v. Murray*, 962 F.2d 302 (4th Cir. 1992), is instructive. There, we rejected a Fourth Amendment challenge to a Virginia law that required convicted felons in custody to submit blood samples for DNA analysis. We concluded that the identification of a person arrested upon probable cause "becomes a matter of legitimate state interest and he can hardly claim privacy in it." *Id.* at 306. Additionally, we recognized that "we do not accept even [a] small level of intrusion, [such as fingerprinting] for free persons without Fourth Amendment constraint." *Id.* at 306-07 (citing

*Davis v. Mississippi*, 394 U.S. 721, 727 (1969)). Thus, we emphasized that a court's constitutional analysis may differ depending on whether the person is an arrestee or a "free person."

Our sister circuits, in upholding DNA collection statutes against Fourth Amendment challenges, likewise have recognized that the status of an individual whose DNA is sought is material to the issue whether he had a reasonable expectation of privacy in that DNA. In *Mitchell*, for example, the Third Circuit sitting en banc upheld the suspicionless collection of DNA samples from arrestees principally on the basis that the fingerprinting of arrestees did not violate the Fourth Amendment. 652 F.3d at 411 (citing *Hayes v. Florida*, 470 U.S. 811, 813-18 (1985) and *Davis*, 394 U.S. at 727); *see also Mitchell*, 652 F.3d at 402 & n.13 (collecting authority and noting that "[e]very federal circuit court to have considered [the federal DNA Act and its state law analogues] as applied to an individual who has been convicted and is either incarcerated or on probation, parole, or supervised release has upheld the constitutionality of the challenged statute"). Additionally, in *United States v. Kincade*, 379 F.3d 813 (9th Cir. 2004) (en banc), a plurality of the Ninth Circuit held that the federal DNA act requiring the collection of DNA samples from convicted felons was constitutional. *See* 379 F.3d at 835-36 (O'Scannlain, J., plurality opinion) (noting "the obvious and significant distinction between the DNA profiling of law-abiding citizens who are passing through some transient status (*e.g.*, newborns, students, passengers in a car or on a plane) and lawfully adjudicated criminals whose proven conduct substantially heightens the government's interest in monitoring them and quite properly carries lasting consequences that simply do not attach from the simple fact of having been born, or going to public school, or riding in a car"); *see also Green v. Berge*, 354 F.3d 675, 678-79 (7th Cir. 2004) (rejecting Fourth Amendment challenge to law requiring DNA samples from felons and contrasting felons from persons not otherwise in custody); *id.* at 679-81 (Easterbrook, J., concurring) (con-

stitutional challenges to DNA–collection statutes differ depending on the status of the person whose DNA is being collected, and noting that "[t]his appeal does not present the question whether DNA could be collected forcibly from the general population").

Unlike the cases cited immediately above, however, which concerned parolees, persons on supervised release, convicted felons, or arrestees, the HCPD had possession of Davis' DNA because he was the victim of a crime. Thus, the above cases inferentially provide support for Davis' position, because they all distinguish an arrestee or one convicted of a crime from members of the general public at large.

These cases, however, do not directly answer the question before us, because they involved challenges to the *collection* of DNA samples, and not, as here, a challenge to the extraction of DNA or retention of a DNA profile when the police already had lawful possession of the DNA sample. And, for the same reason, these cases do not eliminate any consideration of *Edwards* in circumstances like these. *But see United States v. Weikert*, 504 F.3d 1, 16-17 (1st Cir. 2007) (suggesting that "it may be time to reexamine the proposition that an individual no longer has any expectation of privacy in information seized by the government so long as the government has obtained that information lawfully. . . . In short, there may be a persuasive argument on different facts that an individual retains an expectation of privacy in the future uses of her DNA profile").

Nevertheless, we are persuaded by the Supreme Court's analysis in *Skinner*, as applied in *Mitchell* and other cases in the context of DNA, that the extraction of DNA and the creation of a DNA profile result in a sufficiently separate invasion of privacy that such acts must be considered a separate search under the Fourth Amendment even when there is no issue concerning the collection of the DNA sample. *See Mitchell*, 652 F.3d at 407 (citing *United States v. Sczubelek*,

402 F.3d 175, 182 (3d Cir. 2005) (citing *Skinner*, 489 U.S. at 616)).

Based on the foregoing, we conclude that the holding in *Edwards* does not give a law enforcement agency carte blanche to perform DNA extraction and analysis derived from clothing lawfully obtained from the victim of a crime in relation to the investigation of other crimes. Instead, a victim retains a privacy interest in his or her DNA material, even if it is lawfully in police custody. Therefore, we conclude that the extraction of Davis' DNA sample from his clothing and the creation of his DNA profile constituted a search for Fourth Amendment purposes.

We turn to consider whether a separate search occurred when the PGCPD retained Davis' DNA profile in the local CODIS database after the profile did not implicate him in the Neal murder. Our sister circuits do not appear to be uniformly settled on the question whether such entry of a DNA profile into this type of database is a search entitled to Fourth Amendment protection. *Compare, e.g.*, *Boroian v. Mueller*, 616 F.3d 60, 67-68 (1st Cir. 2010) (concluding that the retention and later matching of a lawfully obtained DNA profile is not a search for Fourth Amendment purposes and collecting authority for the same) *with United States v. Amerson*, 483 F.3d 73, 85 (2d Cir. 2007) (in addition to the collection of the DNA sample from a probationer, determining that "[t]here is . . . a second and potentially much more serious invasion of privacy occasioned by the DNA Act" because the "analysis and maintenance of [offenders'] information in CODIS . . . is, in itself, a significant intrusion") (citation omitted) *and Kincade*, 379 F.3d at 841-42 (en banc) (Gould, J., concurring) (suggesting the retention of a lawfully obtained DNA profile once a person has "fully paid his or her debt to society" and "left the penal system" would implicate the person's privacy interest).

These differing conclusions illustrate the fact that at least some courts have concluded that once a DNA profile has been lawfully obtained and entered into CODIS, the retention of that profile and "periodic matching of the profile against other profiles in CODIS for the purpose of identification[,]" is not a search because it does not intrude upon an offender's legitimate expectation of privacy. *Boroian*, 616 F.3d at 67-68 (so holding and citing other authority for the same).[25] Other courts, at least in principle, have left open the possibility that an unrelated examination after DNA retention could be a separate search for Fourth Amendment purposes. *See, e.g.*, *Amerson*, 483 F.3d at 85 n.12.

We need not choose among these competing principles in this case because, as discussed in the next section, we conclude that the extraction and initial testing of Davis' profile was an unreasonable Fourth Amendment search. Accordingly, for purposes of this opinion, we will assume, without deciding, that Davis had a continuing right of privacy in his DNA profile, and that a search occurred in the retention of that profile. We now turn to consider the issue whether the two searches were reasonable.

---

[25]The *Boroian* court relies on *Amerson* as a case supporting this principle. 616 F.3d at 68. However, a careful reading of *Amerson* reflects that the Second Circuit found a reasonable expectation of privacy in the retention of a DNA profile in CODIS, and periodic matching of the profile, *see* 483 F.3d at 85 n.12, 86, but ultimately concluded that the search was justified under the special needs test. *Id.* at 86-87 (upholding the federal DNA Act against Fourth Amendment challenges and "acknowledg[ing] that the DNA profile of appellants will be stored in CODIS, and potentially used to identify them, long after their status as probationers—and the reduced expectation of privacy that such a status involves—has ended," but concluding that fact did not "change[ ] the ultimate analysis.")

3.

*Whether the Searches Were Reasonable Under the Fourth Amendment?*

As noted above, not every warrantless search violates the Fourth Amendment. Instead, a Fourth Amendment violation occurs when a warrantless search is unreasonable. *See Skinner*, 489 U.S. at 619. Courts have employed several different approaches in assessing reasonableness.[26] With regard to searches in which there is an absence of individualized suspicion, the "general Fourth Amendment approach" is to "examine the totality of the circumstances" to determine whether a search is reasonable. *Samson v. California*, 547 U.S. 843, 848 (2006). Under this approach, the reasonableness of a search "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* (citation and internal quotation marks omitted).

---

[26]Even in cases where a person is subject to some type of criminal charge or restraint, there are varying viewpoints regarding the proper approach and its application. In the Ninth Circuit's *Kincade* case, which was heard en banc, a five-member plurality voted to uphold the federal DNA Act against a Fourth Amendment challenge and employed a totality of the circumstances test. 379 F.3d at 832 (en banc) (O'Scannlain, J., plurality opinion). Judge Gould, concurring in the result, voted to uphold the Act, but would have applied the "special needs" analysis. *Id.* at 840 (Gould, J., concurring). Five dissenting judges would have found a Fourth Amendment violation, but would have employed different approaches. *See id.* at 842-76 (dissenting opinions); *see also id.* at 830-31 (O'Scannlain, J., plurality opinion) (collecting authority and comparing cases which have applied a special needs test in the context of DNA profile collection and cases which have applied a "totality of the circumstances" balancing test); *Mitchell*, 652 F.3d at 403 n.15 (noting that only the Second and Seventh Circuits have consistently held that the special needs test should apply in addressing the constitutionality of a DNA indexing statute and concluding that the totality of the circumstances is the proper test).

For example, in *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court applied the totality of the circumstances approach in upholding the search of a probationer's apartment based on the presence of "reasonable suspicion," but in the absence of probable cause. *Id.* at 118, 121. Similarly, in *Samson*, the Court upheld a suspicionless search of a parolee applying the same approach. 547 U.S. at 846.

Courts also have applied a "special needs" analysis in certain circumstances to uphold contested searches. *See Griffin v. Wisconsin*, 483 U.S. 868 (1987); *Kincade*, 379 F.3d at 823-832 (en banc) (O'Scannlain, J., plurality opinion) (describing development of the special needs doctrine and various Supreme Court cases utilizing it). The special needs doctrine allows warrantless searches "where a Fourth Amendment intrusion serves *special governmental needs*, beyond the normal need for law enforcement" and "when balancing the individual's privacy expectations against the government's interests leads to the determination that it is 'impractical to require a warrant or some level of individualized suspicion in the particular context.'" *United States v. Rendon*, 607 F.3d 982, 989 (4th Cir. 2010) (quoting *Von Raab*, 489 U.S. at 665-66) (emphasis in *Rendon*)).

The district court found here that the special needs doctrine was inapplicable, because "the governmental interest in this case cannot be characterized as anything other than an ordinary interest in law enforcement." *Davis*, 657 F. Supp. 2d at 651. Thus, the district court employed the totality of the circumstances test. Applying that test, the district court found the extraction of Davis' DNA in conjunction with the Neal murder investigation was "reasonable." *Id.* at 654.

On appeal, Davis argues that the totality of the circumstances test is not applicable, because it applies only when a person being searched has "substantially diminished privacy rights." (Appellant's Br. 53.) Instead, Davis argues that nothing less than a warrant and probable cause would have

allowed the testing and retention of his DNA profile. Davis further argues that, even if the totality of the circumstances test were applicable, the district court applied the test incorrectly. The government also argues that the district court erred in applying the totality of the circumstances test because, in the government's view, *Edwards* resolves the issue against Davis.[27]

We begin this part of our analysis by restating our conclusion that the holding in *Edwards* is not dispositive of the matter under the unique facts before us, and that Davis retained a reasonable expectation of privacy in his DNA profile. We also consider as part of our analysis the fact that Davis' expectation of privacy may have been diminished to some degree because Davis knew that the police had retained his clothing, yet had taken no action to retrieve his personal effects following his release. Thus, we analyze the reasonableness of the searches here under the "totality of the circumstances test."[28] Our employment of this test is consistent with the decisions of most of our sister circuits, which have applied the test in cases where there was a diminished expectation of privacy. *See Mitchell*, 652 F.3d at 403 n.15 (noting that only the Second and Seventh Circuits have consistently held that the "special needs" test should apply instead of the totality of the circumstances test in addressing the constitutionality of a DNA indexing statute).

---

[27]In an alternative argument as to why the retention of Davis' DNA profile does not constitute a separate search, the government contends that once the district court had determined there was no Fourth Amendment violation in the extraction and testing of Davis' DNA from his clothing as part of the Neal investigation, Davis no longer had any expectation of privacy in the DNA profile. (Appellee's Br. at 50-51 (citing *Johnson v. Quander*, 440 F.3d 489, 498-99 (D.C. Cir. 2006) and state court opinions).)

[28]Neither party argues for the application of the "special needs" test here. We also conclude it should not apply here because it applies in contexts "beyond the normal need for law enforcement," *Rendon*, 607 F.3d at 989, and only normal law enforcement interests are involved here.

Applying the totality of the circumstances test here requires us to "assess[ ], on the one hand, the degree to which [the search] intrudes upon [Davis'] privacy, and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 119. When considering the magnitude of the intrusion upon Davis' privacy, we think it very significant that these DNA searches were conducted in 2004, at a time when Davis was a free citizen and had never been convicted of a felony. The PGCPD extracted Davis' DNA from his clothing, created Davis' DNA profile, and checked that profile against evidence on the CODIS database, all while Davis was a free citizen who retained a reasonable privacy interest in his DNA sample and DNA profile, as we have discussed. However, his privacy interest was diminished to a degree by the fact that he knew that the police had retained his bloody clothing, and yet did nothing to retrieve the clothing or otherwise claim ownership in it.

In contrast to many DNA privacy cases, the privacy interest in Davis' bodily integrity was not implicated when police obtained the DNA sample, because it was taken from his clothing, rather than from his person. This too is a factor that we must consider under the totality of the circumstances. *See e.g.*, *Mitchell*, 652 F.3d at 404 (weighing the "minimal" intrusion of privacy caused by DNA sample collection by blood test); *Jones*, 962 F.2d at 307 (weighing "minor intrusion" caused by DNA sample collection by blood test).

We next turn to consider the government's interest in conducting the search. The police, of course, have a strong and important interest in apprehending and prosecuting those who have committed violent crimes, like the Neal murder and the murder of Schwindler in this case. The government also has a legitimate interest in entering and maintaining information in CODIS and in increasing the number of entries in CODIS to improve its efficacy as a crime-solving tool. *See Haskell v. Harris*, 669 F.3d 1049, 1062 (9th Cir. 2012), *reh'g en banc*

*granted*, 2012 WL 3038593 (July 25, 2012) (upholding California law requiring police to collect DNA samples from all adult felony arrestees and citing the government's four "key interests": "identifying arrestees, solving past crimes, preventing future crimes, and exonerating the innocent").

In balancing these competing interests to determine the reasonableness of the searches at issue, we are guided by the weighty reasons underlying the warrant requirement: to allow a detached judicial officer to decide "[w]hen the right of privacy must reasonably yield to the right of search," and not "a policeman or Government enforcement agent." *Johnson v. United States*, 333 U.S. 10, 13-14 (1948) (quoted in *Davis*, 657 F. Supp. 2d at 653.) The right protected is "a right of personal security against arbitrary intrusions by official power." *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). The importance of the judge or magistrate in the process is why the exceptions to the warrant requirement are "jealously and carefully drawn." *Id.*

The potential for arbitrary intrusions of one's privacy from warrantless searches in cases involving felons, parolees, or arrestees is mitigated by the fact that officials are required to collect from everyone in that certain group of persons. They cannot selectively choose which persons within a particular group must submit a DNA sample. *See, e.g.*, *Mitchell*, 652 F.3d at 415 (the search is further rendered reasonable because "there is no room for law enforcement officials to exercise (or abuse) discretion by deciding whether or not to collect a DNA sample"); *Amerson*, 483 F.3d at 82 ("[T]he programmatic nature of the 2004 DNA Act—all felons are required to submit DNA samples, and the uses of those samples are strictly circumscribed—leaves no discretion for law enforcement personnel to decide whether to force an individual to submit to a taking of a DNA sample or how to use the information collected. This lack of discretion removes a significant reason for warrants—to provide a check on the arbitrary use of government power. *See Skinner*, 489 U.S. at 621-22.").

In this case, by contrast, Davis' DNA was specifically sought as a result of police suspicions that he was involved in the Neal murder, and based on some quantum of proof amounting to less than probable cause. Indeed, the parties' briefs and the record before us are devoid of any factual basis for concluding that Davis was involved in the Neal murder. Thus, the precise concern that the warrant requirement was designed to alleviate is plainly before us here. That fact alone severely diminishes the reasonableness of the search. Thus, our comparison of the respective interests leads us to conclude that the government's extraction of Davis' DNA sample from his clothing and creation of his DNA profile for testing in the Neal murder investigation constituted unreasonable searches under the Fourth Amendment.

Lastly, we assume, without deciding, that the entry and retention of Davis' profile into the CODIS database under these circumstances was also unreasonable under the Fourth Amendment, because the police only had Davis' DNA profile as a result of a Fourth Amendment violation resulting from the extraction and testing of his DNA profile against the DNA in the Neal investigation.

The conclusion that Fourth Amendment violations occurred does not end our inquiry, however. Instead, as we discuss next, we conclude that the exclusionary rule should not be applied to remedy these violations.[29]

---

[29]Subsequent to briefing and argument in this case, the Maryland Court of Appeals upheld an as-applied constitutional challenge to a portion of the Maryland DNA Collection Act (enacted several years after the events in the case at bar) that authorizes the warrantless collection and uploading of certain arrestees' DNA into the Maryland DNA database. *See King v. State*, 42 A.3d 549 (Md. 2012). (The mandate in *King*, however, has been stayed pending the Supreme Court's ruling on the state's petition for certiorari. *See*, *Maryland v. King*, ___ S. Ct. ___, 2012 WL 3064878 (July 20, 2012)). The *King* court, as we have, utilized a "totality of the circumstances" test to determine whether the search at issue was reasonable.

IV.

*The "Good Faith" Exception to the Remedy of Suppression*

Having determined that there was a Fourth Amendment violation in the extraction and testing of Davis' DNA profile, and having assumed, but not decided, there was a second violation in the retention of his profile, we address whether suppression is the proper remedy. *Leon*, 468 U.S. at 906 ("Whether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.") (citation and internal quotation marks omitted). As noted, the district court concluded that suppression was not warranted because the "good faith" exception to the exclusionary rule was applicable. For the reasons discussed below, we agree.

The Supreme Court articulated the "good faith" exception to the exclusionary rule in *Leon*, 468 U.S. at 920. In that case, the Court refused to apply the exclusionary rule where police

---

We note, however, that the ultimate conclusion of the *King* Court does not alter our analysis. First, the case is factually distinguishable. Not only did it involve a portion of Maryland's DNA statute not in effect at the time of events in the case at bar, but it involved the taking of a DNA swab from an arrestee, rather than the creation of a DNA profile from a victim's DNA sample already lawfully in police possession. Second—and significantly—the *King* Court did not address at all the application of the good faith exception, nor is there any indication in the opinion that it was asked to do so.

Since the question is not before us, we express no opinion on the *King* Court's conclusion, although we note that it is contrary to decisions by the Third and Ninth Circuits. *See, e.g*, *supra* at 31-32, 38-39 (citing *Haskell v. Harris*, 669 F.3d 1049, 1062 (9th Cir. 2012), *reh'g en banc granted*, 2012 WL 3038593 (July 25, 2012) and *United States v. Mitchell*, 652 F.3d 387, 407 (3d Cir. 2011) (en banc), both of which upheld statutes requiring the collection of DNA from arrestees).

properly executed a search warrant, but it was later determined the issuing magistrate had erred as the warrant lacked probable cause. *Id.* at 922. The Supreme Court has also applied the "good faith" exception to warrantless administrative searches performed in good-faith reliance on a statute later declared unconstitutional, *Illinois v. Krull*, 480 U.S. 340 (1987), and to an arrest by police who reasonably relied on erroneous information, entered by a court employee into a court database, that an arrest warrant was outstanding, *Arizona v. Evans*, 514 U.S. 1, 14 (1995).

The Supreme Court's recent decisions applying the exception have broadened its application, and lead us to conclude that the Fourth Amendment violations here should not result in the application of the exclusionary rule. *See Herring*, 555 U.S. at 135; *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011).

In both *Herring*, and *Davis*, the Supreme Court emphasized the crucial role that deterrence plays in determining whether to apply the exclusionary rule. Specifically, "the benefits of deterrence must outweigh the costs." *Herring*, 555 U.S. at 141 (citing *Leon*, 468 U.S. at 910 (1984)). That is, courts must weigh the deterrent effect of applying the rule against the cost to society. The "principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Id.* at 141 (quoting *Leon*, 468 U.S. at 908).

In determining the deterrent effect of applying the rule, the *Herring* Court explained that the deterrent effect is higher where law enforcement conduct is more culpable. Thus, "'an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus' of applying the exclusionary rule." *Id.* at 143 (quoting *Leon*, 468 U.S. at 911).

The *Herring* Court explained that the rule should not be applied where excluding the evidence would have little deter-

rent effect on future constitutional violations by law enforcement officers, and the cost to society of such a rule is high. *Id.* at 147-148 (concluding that "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way'" and the exclusionary rule should not be applied).

In *Herring*, the mistake made by police was that a police department in Dale County, Alabama told the neighboring Coffee County police that the defendant had an outstanding arrest warrant in Dale County. *Id.* at 137-38. In fact, the Dale County arrest warrant had been recalled five months earlier, but had never been deleted from the electronic database. *Id.* at 138. After being given the incorrect information that the warrant was outstanding, a Coffee County police officer detained Herring, and found drugs and a gun on his person. *Id.* Herring sought to exclude the evidence seized from his person. *Id.* at 137.

The majority distinguished the negligent conduct involved in *Herring* from earlier cases where the good faith exception did not apply, calling the error before it the "result of isolated negligence attenuated from the arrest." *Id.* at 137.

More recently, the Supreme Court followed the *Herring* analysis in *Davis*, 131 S. Ct. 2419, where the Court considered "whether to apply [the exclusionary rule] when the police conduct a search in compliance with binding precedent that is later overruled." *Id.* at 2423. The Court ruled that the exclusionary rule should not be applied in those circumstances, "[b]ecause suppression would do nothing to deter police misconduct . . . and because it would come at a high cost to both the truth and the public safety." *Id.* In so ruling, the Court again expounded on the balancing test that courts must apply after finding a Fourth Amendment violation: "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* at 2427 (citing *Herring*, 555

U.S. at 141, and *Leon*, 468 U.S. at 910). Justice Alito, writing for the Court, elaborated:

> The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way.

*Davis*, 131 S. Ct. at 2427-28 (internal citations, quotation marks and brackets omitted).

The *Davis* Court also reviewed the line of "good faith exception" cases, starting with *Leon*, concluding that "in 27 years of practice under *Leon*'s good-faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." *Id.* at 2429 (quoting *Herring*, 555 U.S. at 144.)

Indeed, the *Davis* Court focused on the issue of culpability as the decisive factor in the case before it:

> Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis' claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu[l]" deterrence, and culpable enough to be "worth the price paid by the justice system." *Herring*, 555 U.S. at 144. The conduct of the officers here was neither of these things. The officers who conducted the search did not violate

Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence. *See ibid.* Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. *Ibid.*

*Davis*, 131 S. Ct. at 2428.

In order to properly apply *Leon*, *Herring*, and *Davis* here, we must focus on the culpability of the actors who committed the violations. The government mistakenly argues that we should focus on the conduct and "good faith" of PGCPD Detective Blazer, who, based on the cold hit, obtained the warrant for Davis' known DNA. It is true that nothing in the record suggests that Detective Blazer engaged in any culpable, or even negligent, conduct. He relied in good faith on the cold hit obtained and followed proper procedures in getting a search warrant based on it. There is nothing to suggest that his conduct was improper or that he had any obligation to look behind the cold hit match to see if there was some earlier constitutional violation.

But the deterrent effect of the exclusionary rule must be judged at the point of the constitutional violation, and the culpability of the actors involved then. The pertinent inquiry is whether we apply the exclusionary rule to keep similar violations from happening again; here, to prevent and deter the warrantless extraction of a victim's DNA from materials lawfully in police custody when he later becomes a suspect and then to deter that DNA profile from being retained. Thus, we look at the culpability of the police officers involved in those decisions, not at Detective Blazer.

As to the first violation, the extraction and testing of Davis' DNA in connection with the Neal murder, we find nothing in the conduct of the PGCPD officers that would warrant exclusion. As an initial matter, the PGCPD officers had no reason to question that Davis' blood was lawfully within HCPD cus-

tody and indeed, we have concluded that the clothing was properly in police custody.

Although we do not have detailed testimony before us as to the subjective motivations of the PGCPD officers who obtained the clothing and requested it be tested, the unique facts of this case reflect, at most, isolated negligence. What the officers did here was to obtain clothing that was lawfully in police custody and to test it for evidence. Significantly, the only reason they knew of the clothing's existence was because of Davis' *arrest* on drug charges when he left the hospital in Howard County. Had the clothing been obtained initially because of his arrest (like the other items on the property form), *Edwards* and *Wallace v. State*, 816 A.2d 883 (Md. 2003), a Maryland Court of Appeals decision applying *Edwards*, likely would have permitted the testing. Thus, attributing culpability to the officers at this stage would be based on either: (1) their failure to learn, or recognize, that the clothing was in police custody because Davis was a victim, rather than an arrestee; or (2) assuming they did know the clothing had been seized from a crime victim, their failure to recognize that Davis' dual status as victim and arrestee might change the legal analysis set forth in *Edwards* and *Wallace*. This is simply not the type of "flagrant," or "intentional . . . patently unconstitutional" conduct that warrants the application of the exclusionary rule. *See Herring*, 555 U.S. at 143-44. The conduct of PGCPD officers, in testing the blood contained on otherwise lawfully-seized clothing, does not constitute the type of "deliberate, reckless or grossly negligent" conduct that warrants exclusion. *See id.* at 144. As the *Herring* Court explained, "[a]n error that arises from nonrecurring and attenuated negligence is thus far removed from the core concerns that led us to adopt the rule in the first place." *Id.*

The dissent's mantra of "deliberate and intentional" police conduct at each step in the factual scenarios here, *see post* at 93, does not alter the facts as we have set them forth or the proper analysis to be applied to them. To be sure, the police

took the steps that they did deliberately and intentionally in the sense that their actions were not accidental. But for the reasons we explain, one could insert "innocently" or "without knowledge of any constitutional violation," before each of those actions.

Likewise, as to any violation that occurred when the analyst entered Davis' DNA profile into the database after he was not a match in the Neal murder investigation, the record simply does not disclose anything that suggests that this action was anything other than an isolated, negligent incident at best. There is nothing, first of all, to show that the analyst here knew or should have known entering the data would violate the Fourth Amendment. Indeed, the many court decisions (including this Court's decision in *Jones*), that have considered challenges to the use of DNA evidence have uniformly upheld statutes and other laws allowing the collection and testing of DNA evidence.

Additionally, while the paperwork accompanying Davis' clothing indicated that it came from a victim's clothing (J.A. 164, Supp. J.A. 76), it is not at all clear that the analyst actually knew anything other than that the evidence came from a "suspect in a shooting." (Supp. J.A. 93.) Similar to *Leon* and *Herring*, where officers relied on records from others in law enforcement, the PGCPD officers were relying on the fact that the HCPD had lawfully obtained the evidence. Indeed, while we rejected the government's broad construction of *Edwards* based on the fact that Davis was a victim when police seized his clothing, courts have repeatedly held, in broad terms, that evidence lawfully seized by one police agency may be given to another, even for a different purpose and even for additional testing.[30]

---

[30]*See, e.g.*, *Wallace*, 816 A.2d at 896-97 (collecting cases); *Williams v. Commonwealth*, 527 S.E.2d 131, 136 (Va. 2000) (holding that defendant had no expectation of privacy in boots that were seized incident to his arrest and thus that "later examination of the property by another law

So, while we have determined for purposes of this opinion that *Edwards* did not allow the testing because Davis, as a victim, retained an objectively reasonable expectation of privacy in his DNA, that does not mean that the PGCPD officers and DNA analyst were not acting in a good faith belief that they had authority to do that testing under *Edwards* and similar cases.

Additionally, there is no evidence before this Court that the retention of a DNA profile in circumstances like that of Davis, is a systemic or recurring problem. The dissent disagrees, relying heavily on what it describes as an "admission" of the government at oral argument that the constitutionally violative conduct here was "clearly systemic." *See post* at 90. In our view, that reliance is misplaced. At oral argument, in response to questioning, counsel for the government briefly set forth the basic PGCPD policy or practice that the analyst was following.[31] Specifically, counsel explained that if a piece

---

enforcement official [with a different department] does not violate the Fourth Amendment", even if being examined for a different charge than the charge for which he was arrested); *United States v. Turner*, 28 F.3d 981, 983 (9th Cir. 1994) (removal of defendant's cap from jail by postal inspector without a warrant was proper since it remained in the possession of the police); *United States v. Thompson*, 837 F.2d 673, 674 (5th Cir. 1988) ("A person lawfully arrested has no reasonable expectation of privacy with respect to property properly taken from his person for inventory by the police. Later examination of that property by another law-enforcement officer is, therefore, not an unreasonable search within the meaning of the Fourth Amendment."); *United States v. Johnson*, 820 F.2d 1065, 1072 (9th Cir. 1987) (money seized by state authorities upon defendant's arrest for driving under the influence could be later reviewed by a federal agent to obtain serial numbers in a robbery investigation without a warrant); *United States v. Jenkins*, 496 F.2d 57 (2d Cir. 1974) (relying on *Edwards* to conclude there was no Fourth Amendment violation where a federal agent took "second look" and seized without a warrant money that had been taken from the defendant following his arrest on unrelated state charges and maintained in the jail safe).

[31]Counsel prefaced her comments by referencing the policy at the time Davis' profile was uploaded. The record does not disclose whether that policy has changed in light of subsequent developments in the Maryland or federal DNA laws, or as a result of decisions like the district court's decision in the instant case, issued in 2009.

of evidence was analyzed for DNA evidence and a DNA profile was obtained from it, or if a DNA profile was obtained from a "known sample," then those DNA profiles were uploaded into the local CODIS database.

From this, our dissenting colleague assumes that evidence tainted by antecedent constitutional violations would also be uploaded to the database. But while it is possible to imagine, given the policy as articulated, that DNA evidence obtained by an illegal search or pursuant to an illegal arrest might end up in CODIS, there is no testimony before us as to whether that actually happened in any other instance. Indeed, defense counsel conceded at oral argument that the evidentiary record before this Court does not contain a single other example of a person's DNA being placed into the PGCPD local CODIS database without a proper constitutional basis. Any conclusion to that effect is purely speculative.

Moreover, as we have repeatedly made clear, our finding of a constitutional violation in this case was based on the specific and unusual facts of this case. Here, the police properly seized a piece of evidence from a victim in one crime, but then unconstitutionally used DNA evidence extracted from that evidence in investigating an unrelated crime in which the original victim was a suspect. They did so without consent from the victim and without obtaining a warrant, and thus we have found a violation. But a change in any one of those facts might have rendered the inclusion of Davis' DNA in CODIS constitutionally permissible. For example, had the clothing been taken from Davis as part of an inventory search at the time of his arrest for the present crime, as was the clothing in *Edwards*, rather than seized from him when he was a victim of a different crime, the result likely would have been different. Similarly, had the police obtained a search warrant to extract Davis' DNA from his pants and test it in conjunction with the Neal murder, the result likely would have been different.[32] So, the mere fact that other victims' DNA might be

---

[32]Because those are not the facts before us, we need not resolve the constitutionality of the DNA searches in those hypothetical cases. But those

present in the database does not mean there were other constitutional violations.

Likewise, there is no evidence before us that the analyst acted with knowledge that she should not retain the profile.[33] Like the conduct at issue in *Herring* and in *Davis*, then, the conduct here stands in stark contrast to the cases in which the exclusionary rule has been applied, described by the *Herring* Court as "patently unconstitutional" conduct. *See Herring*, 555 U.S. at 143. Moreover, given the evolving and unsettled law governing DNA searches and seizures (as amplified by the district court's lengthy decision in this case, the briefs on appeal, and the lack of controlling Fourth Circuit or Supreme Court precedent), the conduct of the officers entering and retaining Davis' DNA profile can hardly be characterized as brazen or reckless.

We also note that Congress and the Maryland legislature, through their imposition of fines and criminal penalties for failures to comply with their respective DNA statutes, already provide a deterrent effect against similar and future potential misuses of DNA information. Md. Code Ann. Pub. Safety § 2-512 (providing penalties for persons who misuse, disclose, or fail to destroy certain DNA records as required by the Maryland Act); 42 U.S.C. §§ 14135e(c), 14132(c) (same as to federal DNA act). This factor, too, militates in favor of judicial restraint in exercising the remedy of suppression,

---

slight differences in fact might well alter our conclusions regarding the constitutionality of the police actions and the uploading of DNA profiles. Thus, the mere existence of the policy stated by counsel does not necessarily mean that the violation here was anything other than isolated.

[33]While the analyst testified that she knew the state level database required deletion of a profile once a court had exonerated a person previously convicted, there is nothing in the record to support that she knew the profile of either a victim or a suspect was required to be destroyed in the circumstances here, nor has Davis pointed to any statute with such a requirement.

which exacts a "costly toll upon truth-seeking and law enforcement objectives." *Cf. Herring*, 555 U.S. at 141 (citation omitted); *see also Osborne*, 557 U.S. 52, 129 S. Ct. at 2312 (describing the response of the federal government and the states in regulating DNA testing as "prompt and considered").

In short, the obtaining and testing of Davis' DNA from his bloody clothing, and the subsequent inclusion of his DNA profile in the database were, at best, "isolated negligence attenuated from the arrest" [for the Schwindler murder]. *See Herring*, 555 U.S. at 137. We have no proof before us showing that victims' DNA profiles or individuals cleared of suspicion in an investigation are routinely entered into the local database by PGCPD, or have been entered into the database in any other instance. There is nothing in the record to suggest that the acts here are likely to reoccur. Moreover, the particularly unusual facts of this case—where a victim, with a dual status as an arrestee, later becomes a suspect in an unrelated crime, and there is DNA evidence available as a result of the crime in which the person was a victim—diminish further the likelihood of reoccurrence. The price to society of application of the exclusionary rule here, especially since the DNA evidence against Davis was compelling, would be to allow a person convicted of a deliberate murder to go free. The deterrent effect, if any, would be minimal, especially considering the lack of culpable conduct on the part of the police. Exclusion, therefore, would not "pay its way." *See Davis*, 131 S. Ct. at 2428.[34]

---

[34]Contrary to the dissent's contention, we are not creating a "new, freestanding exception" to the exclusionary rule. *Post* at 88. Rather, we have faithfully applied the Supreme Court's precedent, including its recent application of *Leon* in *Herring* and *Davis*. While the dissent refers to the "narrow holding[s]" in those cases, and deems inapplicable the "broad cost-benefit analysis" that underlies those holdings, *post* at 88, 92, the Supreme Court's analysis in those cases is not dicta, but is the rationale supporting the Court's application of the good-faith exclusion.

For the foregoing reasons, the good faith exception to the exclusionary rule applies and we affirm the district court's denial of Davis' motion to suppress.

V.

Davis' second and final contention is that the district court erred in excluding the testimony of his proffered expert, Dr. Jeffrey Neuschatz. We review a district court's evidentiary rulings, including rulings on the admissibility of expert testimony, for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997); *United States v. Barsanti*, 943 F.2d 428, 432 (4th Cir. 1991) (decision whether to admit expert testimony "will not be reversed absent a clear abuse of discretion"). We have reviewed the pertinent portions of the record on this issue and find no abuse of discretion with regard to this evidentiary ruling.

At trial, in addition to the DNA evidence and other evidence concerning the offenses, there was one witness, Laverda Jessamy, who identified Davis as being one of the robbers at the scene of the bank robbery and Schwindler shooting. She had done so both from a photographic array and in person at trial. In response to this identification, Davis sought to introduce the testimony of Dr. Jeffrey Neuschatz as an expert in eyewitness identifications. According to his expert witness report, Dr. Neuschatz intended to testify that the lineup procedure used with Ms. Jessamy did not meet the good practices guidelines of the American Psychology-Law Society and to testify concerning a number of factors which might result in a misidentification.

The government moved to exclude this evidence, contending that much of the proffered testimony consisted of common sense factors within the jury's understanding and not requiring expert testimony. After a hearing, the district court granted the government's motion to exclude Dr. Neuschatz's testimony on the grounds that it would not assist the jury. The

court also explained that the testimony was not admissible under Fed. R. Evid. 403. In particular, the district court concluded that the probative value of the testimony was low because there was significant other evidence of guilt other than the eyewitness testimony and it was not a case where the government was relying, either exclusively or primarily, on eyewitness testimony. Thus, the danger of unfair prejudice, confusing of the issues or misleading the jury heavily outweighed the probative value of the testimony.

We have reviewed Dr. Neuschatz's report and his testimony at the *Daubert* hearing, and find that the district court did not abuse its discretion in concluding that the proffered evidence was not "scientific knowledge" that would be of benefit to the jury. This is consistent with our prior decision in *United States v. Harris*, 995 F.2d 532 (4th Cir. 1993). In *Harris*, we recognized the "trend in recent years to allow such testimony under [narrow] circumstances," but nonetheless concluded that "jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination." *Id.* at 534-35.

The district court also did not abuse its discretion when concluding that, even if it qualified as a proper subject of expert testimony, the probative value of the testimony, which was low, was outweighed by the danger of prejudice or confusing the jury. Accordingly, it was not an abuse of discretion to exclude the evidence on Rule 403 grounds.

Finally, we also agree with the government that, even if the testimony was wrongfully excluded, it was at most, harmless error. Most of the points that would have been made by Dr. Neuschatz were made by Davis' counsel on cross-examination. The compelling DNA evidence against Davis, as well as the evidence of unexplained cash purchases by him and his girlfriend in the days following the robbery were over-

whelming evidence of guilt. The detailed jury instruction given by the court, moreover, further recognized and correctly advised the jury as to the legal issues concerning eyewitness identifications. In light of all these factors, we find no abuse of discretion by the district court in excluding the witness.

VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

DAVIS, Circuit Judge, dissenting:

There is much in the majority's thoughtful and thorough opinion with which I agree. Alas, however, "I feel constrained by a sense of duty to express my nonconcurrence in the action of the court in this present case." *Twining v. New Jersey*, 211 U.S. 78, 114 (1908) (Harlan, J., dissenting). I part company from the majority on two issues: (1) its application of the plain view exception to justify the seizure of the bag containing Davis's clothing from the hospital and the subsequent search of that bag and (2) its refusal to apply the exclusionary rule.[1] I conclude for the reasons explained herein that the sei-

---

[1]The majority "assume[s], without deciding, that there was a separate Fourth Amendment violation in retaining Davis' DNA profile in the local CODIS database." Maj. Op. at 9-10. While it is not critical to my analysis in this case, I would likely hold that under circumstances such as those presented here, the state action involved in (1) extracting Davis's DNA from the biological material recovered from his clothing, (2) chemically analyzing that material to create a DNA profile, and (3) uploading the profile into the local DNA database essentially constitutes a single continuous course of constitutionally implicated endeavors subject to Fourth Amendment scrutiny. Governments undertake to engage in this full course of conduct inasmuch as the purpose of this extraordinary forensic science is to enable law enforcement to identify persons, and that cannot be achieved through less than the full protocol we have come to know. For present purposes, however, I join in the majority's assumption.

zure of the bag was unlawful and, even assuming the seizure could somehow be justified, the subsequent *search* of the bag effected a distinct violation of Davis's constitutionally protected privacy interests. Furthermore, I conclude that the majority's creation of a free-standing, ad hoc exception to the exclusionary rule is unwise and unsupported by the facts of this case, extant Supreme Court precedents, or our own precedents. Thus, I would vacate the judgment, reverse the denial of Davis's motion to suppress, and remand this case for further proceedings, as appropriate.[2]

## I.

### A.

On August 29, 2000, Davis was treated at Howard County (Maryland) General Hospital for a gunshot wound to his right thigh. Davis told hospital staff that he had been shot in the course of a robbery. As required by state law, hospital personnel notified the Howard County Police Department ("HCPD") that it was treating a gunshot victim. *See* Md. Code Ann., Health-Gen. § 20-703. Detective Joseph King of the HCPD, then a uniformed patrol officer, was the first to respond to the hospital; King spoke with Davis concerning the circumstances of the shooting. Detective King testified at the suppression hearing that the hospital had been on his beat for approxi-

---

[2]I would not reach the question whether the district court properly excluded the testimony of Dr. Jeffrey Neuschatz, Davis's proposed expert on eyewitness identifications. The district court excluded Dr. Neuschatz's testimony in significant part because it had previously decided to admit the DNA evidence, which meant that "the significance of eyewitness identification" in the case was "[not] high." J.A. 2323. Because I would reverse the district court's denial of Davis's motion to suppress the DNA evidence, that premise of the district court's decision would no longer apply, and in a retrial without that evidence the court might very well come to a different conclusion. Thus, I find it unnecessary to address the district court's grant of the government's motion to exclude Dr. Neuschatz's testimony.

mately two years, and that he had responded on previous occasions to individuals with gunshot wounds. When he arrived at the hospital, he located Davis in the emergency room on a bed or gurney. According to Detective King, Davis presented him with a District of Columbia driver's license that showed his photograph and the name "Gary Edmonds."

Detective King observed Davis's gunshot wound. He then seized a bag containing Davis's pants and boxer shorts, which had been removed by hospital personnel, placed in the bag, and stored on a shelf beneath the bed. Detective King testified that he considered the clothing to be evidence of the crime reported, i.e., Davis's shooting. Detective King did not receive assistance from hospital personnel in retrieving the bag, which he testified was similar to other occasions on which he had responded to the hospital to investigate shootings. Detective King did not seek or obtain Davis's consent to take the bag or otherwise discuss the matter with Davis. He assumed Davis was aware that he was taking the bag because Davis observed him take possession of it. Detective King described Davis's attitude towards questioning as "uncooperative." J.A. 143.

A short time later, Lieutenant Steven Lampe appeared at the hospital. Lieutenant Lampe took the bag from Detective King and later submitted it to the HCPD property room to be held as evidence. Lieutenant Lampe testified that the clothing was in a plastic bag when he took it from Detective King, but he could not recall what the bag looked like. Lieutenant Lampe did not inspect the clothing right away. Consistent with Detective King's testimony, he stated that Davis was not forthcoming in response to questioning, gave only vague information about the shooting, and was not interested in reporting the crime. After speaking with Davis, the police attempted to confirm his identity through various computer inquiries and found no history of a "Gary Edmonds."

Because the officers believed that Davis was being untruthful in his report of how he was shot, in part due to his lack

of cooperation, the officers located the vehicle in which Davis's friend had driven him to the hospital, observed what appeared to be blood on the front passenger seat, and requested a K-9 officer to have his dog scan the car. The dog positively alerted to the presence of a controlled dangerous substance ("CDS"), and the car was searched. The police recovered a small amount of marijuana in the vehicle and accordingly arrested Davis and took him into custody upon his release from the hospital later that day. Lieutenant Lampe testified that the hospital staff had given Davis something to wear, Davis's clothing having been seized by Detective King. The police subsequently identified Davis by his fingerprints as "Earl Davis," and he admitted his true identity. Davis was charged with possession of marijuana and possession of CDS paraphernalia, but the charges were later dismissed.

The investigation into Davis's shooting concluded without an arrest, and the case was considered closed as of November 7, 2000. To that point, no forensic testing had been conducted on the bloody clothing seized from Davis at the hospital. Davis was not contacted or otherwise advised that the shooting investigation was closed.

Several months later, in June 2001, an individual named Michael Neal was murdered in nearby Prince George's County, Maryland. At some point in the ensuing three years detectives in the Prince George's County Police Department ("PGCPD") came to suspect Davis of having committed the murder. In the course of investigating the Neal murder, in April 2004 members of the PGCPD contacted Lieutenant Lampe to inquire about Davis's arrest at Howard County General Hospital in 2000. The PGCPD officers specifically asked whether any property had been seized from Davis that might contain his DNA. Lieutenant Lampe understood from this inquiry that Davis was now a suspect in a homicide. Later that month, two PGCPD homicide detectives who were familiar with the facts of the Neal murder went to the HCPD to pick up Davis's clothing for the purpose of DNA testing.

Lieutenant Lampe delivered the clothing to the PGCPD detectives on April 29, 2004. On the property form for the clothing, Davis was clearly identified as a "victim." J.A. 164. Davis was not notified that the PGCPD had obtained his clothing. The PGCPD detectives submitted Davis's clothing to their DNA lab in connection with their investigation of the Neal murder.

Shortly thereafter, in or around June 2004, Davis's DNA was extracted from the blood stains on his boxer shorts, his profile was created, and the profile was compared to an unknown DNA profile derived from evidence obtained at the scene of the Neal homicide. The profiles did not match, and Davis was therefore excluded as the source of the evidentiary sample from the Neal murder. Davis's DNA profile was then entered into the local Prince George's County Combined DNA Index System ("CODIS") database. His DNA profile was never expunged or otherwise removed from the database.

B.

On August 6, 2004, shortly before 1:00 p.m., Jason Schwindler, an armored car employee, picked up a bank deposit from a local business and took it to a nearby BB&T bank in Hyattsville, Maryland, located in Prince George's County. As Schwindler walked up to the bank entrance, two gunmen exited a Jeep Cherokee and shot Schwindler, killing him. When their escape in the Jeep was thwarted by the armored truck driver, the assailants carjacked a bank customer and fled in her Pontiac Grand Am. The carjacked vehicle was later recovered.

After Schwindler's murder, officers from the PGCPD responded to the crime scene and collected evidence. Numerous items were recovered, including a baseball cap worn by one of the shooters, two firearms, and steering wheel covers from the Jeep Cherokee and the Pontiac Grand Am, the vehicles the shooters had driven to and away from the crime

scene, respectively. These items were swabbed and analyzed for DNA. The DNA profiles of the major contributor to the DNA found in the ballcap and on the trigger and grip of the recovered firearms were entered into the Prince George's County CODIS database. As a result of a search of the local database, on or about August 14, 2004, there was a "cold hit" between the DNA profile derived from material found on the baseball cap recovered at the crime scene and Davis's DNA profile in the database.

Law enforcement officers were notified of the match and, based on the cold hit, they promptly sought, and a state judge issued, warrants authorizing them to obtain DNA from Davis and to search the home of his girlfriend, Dana Holmes. Pursuant to the search warrant, a DNA sample was taken from Davis and his DNA profile was compared to the profiles derived from the DNA deposited on items recovered from the crime scene. The DNA analyst concluded that, to a reasonable degree of scientific certainty, Davis was the source of the DNA recovered from three pieces of evidence related to the Schwindler murder: (1) the steering wheel cover of the stolen Jeep Cherokee the assailants drove to the bank; (2) a baseball cap dropped by one of the assailants during the course of the robbery; and (3) the steering wheel cover of the Pontiac Grand Am in which the assailants fled the scene.

## C.

On March 31, 2008, a federal grand jury returned a superseding indictment charging Davis with one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1959; two counts of possession and discharge of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c); one count of possession and discharge of a firearm resulting in death (murder), in violation of 18 U.S.C. § 924(j); one count of carjacking, in violation of 18 U.S.C. § 2119; and one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Davis pleaded not guilty and proceeded to trial.

Prior to trial, Davis moved to suppress all direct and derivative evidence obtained from the warrantless seizure of his clothing at Howard County General Hospital, including his DNA profile. The district court denied Davis's motion to suppress after holding an evidentiary hearing and, following the conclusion of trial, filed a thoughtful opinion accepting some of Davis's arguments and rejecting others, but ultimately reaffirming its earlier denial of the motion to suppress. *United States v. Davis*, 657 F. Supp. 2d 630 (D. Md. 2009).

The DNA evidence presented at trial consisted of the PGCPD analyst's finding that Davis's DNA profile matched the DNA profile derived from the evidence recovered from the scene of the Schwindler murder to a reasonable degree of scientific certainty. Davis challenged the validity of the analyst's findings. In particular, he questioned whether the amount of DNA recovered from the crime scene was sufficient to produce accurate results and whether the government's statistical probability calculations (i.e., the statistics supporting the conclusion that Davis was the source of the DNA on each of the three items recovered from the crime scene) were reliable and accurate.

Davis's trial began on May 5, 2009, and lasted approximately five weeks. At the conclusion of the trial on June 3, 2009, the jury returned a guilty verdict on all counts. The district court sentenced Davis to a term of life imprisonment plus 420 months. Davis timely appealed the district court's denial of his motion to suppress and grant of the government's motion to exclude expert testimony.

II.

As the majority explains, Davis argues the district court committed reversible error in denying his motion to suppress DNA evidence. He contends that the following separate Fourth Amendment violations led to the "cold hit" match that

implicated him in the Schwindler murder.[3] First, Davis argues that the initial nonconsensual, warrantless seizure of the bag of clothing from Howard County General Hospital by the HCPD in 2000 violated his Fourth Amendment rights. Second, he contends that the related, subsequent nonconsensual, warrantless search of the bag was unlawful, rendering all further uses of the evidence derived therefrom inadmissible as "fruit of the poisonous tree." Third, he asserts that PGCPD officials violated the Fourth Amendment when they extracted and chemically analyzed a sample of his DNA from the clothing without consent or a warrant in 2004. Fourth, Davis contends that the nonconsensual, warrantless uploading and retention of his DNA profile in the local CODIS database constituted yet a further Fourth Amendment violation. Of these four alleged violations, the district court found that only the retention of Davis's DNA profile in the CODIS database constituted a Fourth Amendment violation, although it ultimately concluded that applying the exclusionary rule was not appropriate on the basis of the good-faith exception.

The majority agrees with the district court's analysis in significant part. In particular, the majority agrees that the warrantless seizure of the bag containing Davis's clothing, as well as the subsequent, distinct search of the bag, and the subsequent seizure of the contents of that bag, resulting in the

---

[3]Although the majority, following the lead of the parties, purports to identify *three* alleged Fourth Amendment violations, as I explain within, a proper analysis of this case must distinguish as separate constitutionally cognizable invasions: (1) the seizure of the bag at the hospital followed by (2) the search of the bag. Indeed, as the majority's own analysis shows, *see* Maj. Op. at 13 ("As to both the seizure of the bag and the subsequent search of the bag, the district court's reliance on *United States v. Williams*, 41 F.3d 192 (4th Cir. 1994) was appropriate."), the seizure and search of the bag are indeed distinct undertakings. Moreover, although Davis combined these two challenges in some ways, there is no question that he has challenged each distinct invasion of his rights. *See* Appellant's Br. at 17 ("First, the police illegally seized and searched the white bag containing Mr. Davis' clothes beneath his hospital bed when he came in as a shooting victim four years prior to the Schwindler robbery and shooting.").

extraction of Davis's biological material, all may be justified on the basis of the plain view seizure exception to the warrant clause of the Fourth Amendment. I respectfully dissent from that extraordinary holding. The plain view exception does not apply under the circumstances in this case. Furthermore, even if it could be applied in some plausibly recognizable manner, the plain view seizure doctrine could not possibly justify the separate search of the bag containing Davis's clothing. Accordingly, the majority's substantive Fourth Amendment analysis is fatally flawed, quite apart from its unwarranted refusal to apply the exclusionary rule.

## A.

As the district court correctly observed, *Davis*, 657 F. Supp. 2d at 636, the government bears the burden of proving, by a preponderance, the legality of the search and seizure of evidence obtained without a warrant (or evidence derived therefrom) which it intends to introduce at trial. *See Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) (exigent circumstances); *United States v. Mendenhall*, 446 U.S. 544, 557 (1980) (consent); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (same); *cf. Illinois v. McArthur*, 531 U.S. 326, 338 (2001) (Souter, J., concurring) ("[M]ost states follow the rule which is utilized in the federal courts: if the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution.") (quoting 5 W. LaFave, Search and Seizure § 11.2(b), p. 38 (3d ed. 1996)). In assessing a trial court's ruling on a motion to suppress, we review factual findings for clear error and legal determinations, including "determination[s] of whether the historical facts satisfy a constitutional standard," de novo. *United States v. Gwinn*, 219 F.3d 326, 331 (4th Cir. 2000); *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Wilson*, 484 F.3d 267, 280 (4th Cir. 2007). When a motion to suppress has been denied in the court below, we review the

evidence in the light most favorable to the government. *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998).

B.

The HCPD's original nonconsensual, warrantless procurement of Davis's bloody boxer shorts and pants in 2000 requires that we decide whether the district court erred in its legal conclusion that Detective King was entitled to both seize the bag containing the clothing and to search its contents without consent and in the absence of a judicial warrant. Echoing the district court's analysis, the majority concludes that Detective King was justified in seizing the bag because he had "lawful access" to it and because it was "immediately apparent" to him, and would have been so to any reasonable officer in his position, that the bag contained Davis's pants and that the pants contained a bullet hole, i.e., evidence of a crime. Maj. Op. at 15-16. The majority further elaborates its unique reconception of the longstanding plain view seizure doctrine by concluding that King was justified in searching the bag's contents, without obtaining Davis's consent or a warrant, because it was a "foregone conclusion" that the bag contained evidence of a crime. Maj. Op. at 14, 16 (relying upon *Williams*, 41 F.3d 192).

The majority's analysis is deeply flawed. As I explain in subsection II.B.1, application of rudimentary and long-established Fourth Amendment principles demonstrates that Detective King's seizure of the bag from Davis's possession violated Davis's Fourth Amendment right to be free of an unreasonable seizure of his personal "effects" and cannot be shoehorned into a plain view seizure analysis. Furthermore, as I show more specifically in subsections II.B.2 and II.B.3, long-settled understandings of the plain view seizure doctrine demonstrate that under no reasonable interpretation of the facts found by the district court can it be said that the nonconsensual, warrantless search of the bag was justified under that doctrine. As I demonstrate, neither *Williams*, nor any other

precedent cited to us by the government supports, let alone compels, the remarkable application of the plain view seizure doctrine engaged in by the majority.

1.

It is common ground among the panel that a well-established exception to the Fourth Amendment's warrant requirement provides that a law enforcement officer may seize evidence in "plain view" without a warrant where (1) the officer is lawfully located in a place from which the item can plainly be seen; (2) the officer has a lawful right of access to the item itself; and (3) the incriminating nature of the seized item is immediately apparent. *See Horton v. California*, 496 U.S. 128, 136-37 (1990). As this test makes clear, the intrusions implicated by the first two prongs of the test must be *lawful*. In other words, in both viewing the item to be seized and in actually taking physical possession of it, police must not infringe constitutionally protected privacy or possessory interests in the absence of a warrant or other well-recognized exception to the warrant requirement. *See Texas v. Brown*, 460 U.S. 730, 738-39 (opining that "plain view" should not be considered an independent exception to the warrant requirement, but rather an extension of a prior justification for an officer's "access to an object") (plurality opinion); *see also Horton*, 496 U.S. at 137 n.7 (explaining that the lawful right of access requirement is "simply a corollary of the familiar principle . . . that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances'") (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971) (plurality opinion)).

In addition, the item's incriminating nature must be "immediately apparent" at the time the police view it, meaning that there is a "practical, nontechnical probability that incriminating evidence is involved." *Brown*, 460 U.S. at 742 (internal quotation marks omitted); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("If . . . the police lack probable

cause to believe that an object in plain view is contraband without conducting some further search of the object — i.e., if its incriminating character is not immediately apparent, *Horton*, 496 U.S. at 136 — the plain-view doctrine cannot justify its seizure.") (internal quotation marks and brackets omitted); *Soldal v. Cook County, Illinois*, 506 U.S. 56, 66 (1992) (explaining that "'plain view' seizures . . . can be justified only if they meet the probable-cause standard").

The government has failed to meet its burden here to establish that the seizure of the bag containing Davis's clothing can be justified by application of the plain view seizure doctrine, and the subsequent search of the bag could never be justified by the plain view seizure doctrine in any event, no matter how much evidence the government could muster.

There is no dispute that Detective King was lawfully present in the emergency room where Davis was being treated, and thus viewed the bag from a lawful vantage point. There is a constitutionally cognizable distinction, however, between the emergency room generally and the more narrowly delineated area beneath Davis's bed where the bag had been stored. Thus, the majority fails (or simply refuses) to recognize that although this case does not involve the paradigmatic factual scenario in which police view an item through a window before entering a premises to retrieve it, *see* Maj. Op. at 11-12, the lawful vantage point and lawful access prongs do not necessarily rise and fall together. Rather, there are distinct possessory and privacy interests implicated by the facts before us, namely the specific location of the bag and the fact that it contained non-contraband personalty or, to use the constitutional parlance, Davis's constitutionally protected "effects."

As a matter of law, Davis never relinquished his possessory rights in his effects prior to their seizure. *See United States v. Neely*, 345 F.3d 366, 369 & n.4 (5th Cir. 2003) ("[A]n emergency room patient does not forfeit his possessory rights to clothing simply by walking (or in many cases being carried)

through the hospital door.") (collecting cases). Howard County General Hospital personnel ensured that Davis's clothing was in his *immediate personal possession and control* when they placed it in a bag on the shelf directly beneath his bed. *See People v. Yaniak*, 738 N.Y.S.2d 492, 495-96 (Co. Ct. 2001) ("[T]he placing of the garments in the green plastic bag by hospital personnel evinced an objective belief that the items were still the personal property of the defendant and that, when he felt better, they would be returned to him.").

Of course, Davis would have retained his possessory interest in the clothing (and thus the bag containing the clothing), as well as his residual privacy interest in his clothing,[4] even if the hospital had safeguarded it in some other location. *See Neely*, 345 F.3d at 370 (explaining that once clothing is taken from the patient and secured by hospital employees, the hospital becomes a bailee and employees have no authority to permit police to retrieve the clothing without a warrant) (citation omitted). In addition, there is no evidence that Davis abandoned his clothing or that he consented to the seizure. Accordingly, under the circumstances, the police no more had "lawful access" to the bag containing Davis's clothing as he lay in the hospital receiving treatment than they would have had if the bag had been locked in a cabinet for patients' belongings or, indeed, held in Davis's hands while he was being treated.[5]

---

[4]Unlike the majority, it is difficult if not impossible for me to imagine that a person, even a hospital patient undergoing treatment in an emergency room as was Davis, lacks a reasonable expectation of privacy in his underwear which is concealed by hospital personnel in a bag and left within easy reach of the patient.

[5]The very case relied on by the majority for its expansive application of the "lawful access" element of the plain view doctrine in response to this dissent makes clear that the typical plain view seizure case involves concern for protection of a citizen's spatial privacy, e.g., the lawfulness of an entry, not with the distinct constitutional question of whether a seizure of a constitutionally protected "effect" from the personal possession of its owner is "lawful." *See* Maj. Op. at 12 (contending that the "lawful right

Manifestly, an officer's physical access to a citizen's non-contraband personalty in the possession of the citizen is not equivalent to an officer's "lawful access" to that personalty under the plain view doctrine. In other words, the mere existence of probable cause to believe a container in the possession of a citizen holds evidence of criminal activity, where the evidence is not contraband, is not alone sufficient to effect a warrantless seizure of that container from the possession of the citizen.[6]

---

of access" requirement "is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances"; thus, while "lawfully positioned" "refers to where the officer stands when she sees the item," "lawful right of access" refers "to where she must be to retrieve the item") (quoting *Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) (holding that disputed issue of fact precluded summary judgment for officers in plaintiff's Fourth Amendment claim under 42 U.S.C. § 1983 where plaintiff disputed officers' assertion that they could see handgun in his car while they were standing outside the vehicle, and thus permissibly entered vehicle to retrieve the firearm and then arrested plaintiff)).

Nor does the majority's invocation of *Washington v. Chrisman*, 455 U.S. 1 (1982), *see* Maj. Op. at 12, aid its cause. In that case, "the officer noticed seeds and a small pipe lying on a desk 8 to 10 feet from where he was standing [in the threshold of defendant's college dormitory room after having detained the defendant's roommate for underage possession of an alcoholic beverage]. From his training and experience, the officer believed the seeds were marihuana and the pipe was of a type used to smoke marihuana. He entered the room and examined the pipe and seeds, confirming that the seeds were marihuana and observing that the pipe smelled of marihuana." 455 U.S. at 4. Chrisman's expectation of privacy *in his room* gave way to the officer's duty to keep in close contact with the roommate, whom the officer had allowed to reenter the room to retrieve his identification, and who had actually consented to the officer's presence. *Id.* at 3. In short, *Chrisman* has nothing whatsoever to do with plain view seizures of, or "lawful access" to the contents of, *containers*.

[6]Imagine, for instance, that a murder suspect's father is sitting in a fast food restaurant eating a salad and reading the morning paper. A homicide detective working the case has been told by a reliable informant that the suspect has admitted to the informant that he, the suspect, had written a

As Davis correctly argues, and as the district court acknowledged, "A warrantless seizure is 'per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions' to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted); *Flippo v. West Virginia*, 528 U.S. 11, 13-14 (1999) (same)." Appellant's Br. at 21; *see Davis*, 657 F. Supp. 2d at 636. The plain view seizure doctrine does not supplant the need for such an exception where an officer intrudes upon constitutionally protected privacy or possessory interests in physically retrieving the item to be seized from the person of its owner. *See Horton*, 496 U.S. at 137 ("[N]ot only

---

full confession and mailed it to his father and that his father keeps the letter with him at all times in a distinctive black briefcase that his father carries wherever he goes. The black briefcase described by the informant is resting on the floor of the fast food restaurant at the feet of the father when the detective enters the restaurant. The detective seizes the briefcase and, without consent or a warrant, immediately opens it. He observes instantly the letter and, quite unexpectedly, wads of counterfeit U.S. currency. The letter is used by the state to prosecute the son for homicide and the possession of counterfeit currency charge is prosecuted in federal court against the father.

Does the majority truly believe that the detective, having what the majority would call "lawful access" to the briefcase, and with probable cause to believe that evidence of a murder would be found in the briefcase, i.e., it was "immediately apparent" (based on the highly reliable information possessed by the detective) that the container held evidence of a criminal offense, could seize the briefcase and search it on the basis of the plain view seizure exception?

Of course not.

Arguably, the briefcase could be seized on the basis of exigency, *see United States v. Chadwick*, 433 U.S. 1 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991), but surely even the majority would agree that a warrant would be required to search the briefcase. Even apart from a nice question of the son's standing to challenge the search of the father's briefcase, there clearly is no standing issue as to the father, and the plain view exception simply could not justify the search of the briefcase, despite the "virtual certainty" that evidence of a criminal offense was contained therein. So it is here.

must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."); *Jones v. State*, 648 So. 2d 669, 678 (Fla. 1994) (explaining that the lawful access requirement "ensures that the scope of the intrusion into Fourth Amendment rights is no greater than that already authorized in connection with the lawful entry"); *see also infra* pp. 83-84 (explaining why seizures of containers holding "mere evidence" are distinguishable from containers holding contraband). Accordingly, in the absence of a recognized justification (e.g., exigent circumstances, which the district court did not find applicable) for intrusion upon Davis's protected interests, Detective King could not lawfully seize the bag under the plain view seizure doctrine from Davis's possession without a warrant or consent, irrespective of whether it was "immediately apparent" that the clothing suspected of being contained therein constituted evidence of a crime.[7] As

---

[7]In my view, the nonconsensual, warrantless seizure of the bag in this case could only be justified by exigent circumstances, rather than by the plain view seizure doctrine. It appears, however, that the government did not press such an argument before the district court, and with good reason. Although the notion that police need clothes with bullet holes in them to help prove someone got shot is beyond fanciful, there is some support for the view that Detective King had probable cause to believe that the bag beneath Davis's bed contained evidence of his shooting. *But see infra* at 77-80 (explaining why the officers' interaction with Davis demonstrated conclusively that they did not believe his story and, accordingly, they lacked probable cause to believe he had been the victim of a felonious shooting). Therefore, particularly given Detective King's testimony that Davis was uncooperative in response to questioning about the crime, King could reasonably have feared that the clothing would disappear due to a deliberate act of Davis or an inadvertent act of hospital personnel. On the other hand, a police officer might have been posted to safeguard the clothing until a warrant was obtained. Regardless, the government does not raise this argument and, as discussed *infra*, the subsequent search of the bag was unconstitutional in any event.

Indeed, as both the majority and district court opinions demonstrate, application of an exigency exception to the warrant requirement would not save the subsequent search of the bag in this case because no conceivable exigency would apply once the bag was in the custody of law enforcement.

the government accurately describes the relevant circum-
stances, "the [bag containing the] clothing was readily acces-
sible to Detective King," Govt's Br. at 33-34, but that most
assuredly does not mean that Detective King had "lawful
access" to the bag or the clothing contained therein under the
plain view seizure doctrine.

2.

Of course, even if Detective King could conceivably, on
some theory, lawfully seize the bag, that does not mean that
he could inspect its contents, i.e., search the bag, without
obtaining Davis's consent or a judicial warrant.[8] "Even when
government agents may lawfully seize such a package to pre-
vent loss or destruction of suspected contraband [or mere evi-
dence], the Fourth Amendment requires that they obtain a
warrant before examining the contents of such a package,"
*United States v. Jacobsen*, 466 U.S. 109, 114 (1984) (brackets

---

[8]It is evident that the police removed Davis's clothing from the bag at
some point, but the record does not indicate when the police first opened
the bag, so it is not clear when the warrantless container search actually
occurred. Lieutenant Lampe testified that the clothing was still in the bag
when he arrived at the hospital and retrieved it from Detective King. He
recalled that the bag was plastic, but could not recall what it looked like,
and he stated that he did not inspect the clothes right away.

To the extent the majority laments the officers' failure of memory about
what the bag looked like and what precisely they did many years before
they were called to testify on behalf of the government in this case, *see*
Maj. Op. 15 n.15, the majority has done little more than highlight still
*another* reason for the imperative of the warrant—issuing function of the
state and federal courts. Had the officers properly conducted themselves
in searching the bag on the authority of a judicial warrant, there would be
no basis for the majority's lament. "Ever since 1878 when Mr. Justice
Field's opinion for the Court in *Ex parte Jackson*, 96 U.S. 727, established
that sealed packages in the mail cannot be opened without a warrant, it has
been settled that an officer's authority to possess a package is distinct from
his authority to examine its contents." *Walter v. United States*, 447 U.S.
649, 654 (1980) (plurality opinion) (citing *Arkansas v. Sanders*, 442 U.S.
753, 758 (1979), and *United States v. Chadwick*, 433 U.S. 1, 10 (1977)).

added), or otherwise satisfy one of the exceptions to the warrant requirement. *Horton*, 496 U.S. at 141 n.11. In other words, as Judge Niemeyer (who, three years earlier, had been a member of the panel in *Williams*) has cogently explained, "The 'plain-view' doctrine provides an exception to the warrant requirement for the *seizure* of property, but it does not provide an exception for a search." *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997) (emphasis in original); *accord United States v. Rumley*, 588 F.3d 202, 205 (4th Cir. 2009).

Only in a very limited subset of cases involving "closed, opaque container[s]" may an officer open the container without first obtaining a warrant or the owner's consent, *Robbins v. California*, 453 U.S. 420, 426 (1981) (plurality opinion), at least where, as here, the container is not located in a vehicle. One exception to the search warrant requirement in this context is in cases involving exigency. *See Chadwick*, 433 U.S. at 15 n.9 ("Of course, there may be other justifications for a warrantless search of luggage taken from a suspect at the time of his arrest; for example, if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon.").[9] Another exception, the one the district court and the majority erroneously rely on, is for "con-

[9]The majority's conclusory assertion that, "[T]he subsequent search of the bag (whether to identify or examine its contents), was warranted if it was a foregone conclusion that the bag contained the clothing, which was evidence of a crime," Maj. Op. at 13, is confounding. As explained below, King could only have opened the bag and inspected its contents if their incriminating nature was so obvious that no "search" occurred — but the majority agrees that a search did occur. Of course, having chosen to ignore entirely this dissent's reliance on *Chadwick*, *Robbins*, and *Sanders*, the majority's sole escape is to stand silent in the face of clearly applicable Supreme Court precedents which cannot rationally be distinguished. Those cases, among others, make clear that whether a search occurs is not simply a matter of "labeling." *Cf.* Maj. Op. at 10 n.11.

tainers (for example a kit of burglar tools or a gun case) [that] by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." *Sanders*, 442 U.S. at 764 n.13. In those cases, because "the distinctive configuration of [the] container proclaims its contents," the owner of the container has no reasonable expectation of privacy in those contents, *Robbins*, 453 U.S. at 427 (plurality opinion) — and thus an officer's observation of those contents does not constitute a separate "search" for Fourth Amendment purposes. *See Illinois v. Andreas*, 463 U.S. 765, 771 (1983) ("If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search'. . . ."). In such cases the shape and/or character of the container, including where relevant its labeling, even if closed and opaque, is constitutionally equivalent to one that is open or transparent, because it "clearly reveal[s] its contents." *Id.*; *see also Arizona v. Hicks*, 480 U.S. 321, 328 (1987) ("[A] truly cursory inspection — one that involves merely looking at what is already exposed to view, without disturbing it — is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion."); *United States v. Payne*, 181 F.3d 781, 787 n.4 (6th Cir. 1999) ("There is no such thing as a 'plain-view search.'").[10]

We have carefully limited the scope of this "proclaims its contents" exception to cases where the incriminating nature of the contents is a "foregone conclusion." *See Williams*, 41 F.3d at 192; *see also Sanders*, 442 U.S. at 764 n.13 (requiring that the container's owner not maintain "*any* reasonable expecta-

---

[10]"As *Robbins v. California* . . . has established, it takes an open package, or one whose configuration is distinctive as to its contents (i.e., a kit of burglary tools or a gun case) to bring into play the plain view exception to the generally unyielding rule that a warrant must first be obtained." *Blair v. United States*, 665 F.2d 500, 513 (4th Cir. 1981) (Murnaghan, J., dissenting); *see id.* at 510 (Murnaghan, J., dissenting) ("It is elementary that probable cause alone does not permit a search. It only provides a substantiating basis for issuance of a warrant.").

tion of privacy" in the contents) (emphasis added).[11] Indeed in *United States v. Corral*, 970 F.2d 719 (10th Cir. 1992), on which *Williams* principally relied, the court found that no search occurred only because there was a "virtual certainty" that the package contained, in that case, cocaine. *Id.* at 726 (quoting *Brown*, 460 U.S. at 751 n.5 (Stevens, J., concurring in the judgment)). The obviousness of a container's contents must be such that an officer's view of the container is "*equiv*alent to the plain view" of the incriminating contents themselves. *Id.* (emphasis added).[12] The analogy we used in

─────────────

[11]To the extent *Sanders* and the *Robbins* plurality required that officers who have probable cause that a vehicle contained evidence of crime must obtain a warrant to search closed containers in the vehicle, those cases were overruled. *See United States v. Ross*, 456 U.S. 798, 825 (1982); *California v. Acevedo*, 500 U.S. 565, 580 (1991). The discussions in *Sanders* and *Robbins* of when the contents of a closed, opaque container are nonetheless obvious, however, remain accurate and unaltered. *See Williams*, 41 F.3d at 196.

[12]The majority suggests, utterly without support in the record, that Detective King's testimony that he observed "a bag underneath of the hospital bed that contained clothing," Maj. Op. at 15 (citing J.A. 140), "fairly supports an inference that Officer King could see the clothing through the bag or that the bag was partially open, revealing clothing," *id.* at 15. The majority's reasoning is clearly flawed; Detective King's conclusory statement reflecting his own personal belief that the bag contained clothing does nothing to confirm that the belief was anything but an unfounded assumption. For instance, if an employee of a McDonald's restaurant stated that a happy meal contained French fries, we could not reasonably infer that the employee had looked into the box. Instead, it is most likely that the employee merely assumed that the customer had chosen that classic side item, when the customer may well have thought better and opted for apple slices instead.

Contrary to the majority's speculation that Detective King seized the clothing because he could actually see it in or through the bag, the government concedes in its brief that Detective King's nonconsensual, warrantless seizure of Davis's personal property was simply King's standard operating procedure. *See* Govt's Br. at 19 ("As was his practice in previous shooting investigations, Detective King secured the victim's clothing, which had been removed by hospital staff to treat the injury . . . ."). The district court's analysis on this point could not be clearer: "There was no

*Williams* illustrates both the centrality to the plain view sei-zure doctrine of the character of the container and the high degree of certainty required: "[W]hen a person opens a Her-shey bar, it is a foregone conclusion that there is chocolate inside." 41 F.3d at 198; *see also Brown*, 460 U.S. at 750-51 (Stevens, J., concurring in the judgment) (concurring in the application of the exception because the container there—a knotted party balloon located in a car close to several small plastic vials, quantities of loose white powder, and an open bag of party balloons—was "one of those rare single-purpose containers which 'by their very nature cannot support any rea-sonable expectation of privacy because their contents can be inferred from their outward appearance'"). Only if the charac-ter of a closed, opaque container proclaims its incriminating contents to such a degree do we excuse officers from obtain-ing a search warrant to open the container, assuming the offi-cer has lawfully come into possession of the container.[13]

---

testimony as to whether the bag was open or closed, or whether it was transparent, opaque, or somewhere in-between." *Davis*, 657 F. Supp. 2d at 638. The majority is not entitled to enhance this negative finding so that it becomes the basis for an inference favorable to the government.

Thus, the majority's extraordinary appellate factfinding ignores the undisputed applicability of the rule that in this case the government bore the burden of proof to establish all the facts necessary to the existence of whatever warrant exception might save the search and seizure in this case, *see supra* p. 61-62. The majority indulges a so-called "inference" never propounded by the government or drawn by the district court, and not sup-ported by any finding of the district court, in favor of the government. *See, e.g.*, Maj. Op. at 15 ("Nothing in the record contradicts such a conclu-sion."). Davis had no burden to disprove anything regarding the lawful-ness of the search of the bag. Any absence of evidence on the point should count against the party with the burden of proof, here the government.

[13]The constitutionality of this corollary to the plain view seizure doc-trine is widely accepted, but there seems to be a circuit split with respect to whether the "foregone conclusion" analysis incorporates extrinsic evi-dence and/or an officer's specialized knowledge. In *Williams* we consid-ered relevant that the officer had years of experience in narcotics investigations. 41 F.3d at 198. Other circuits have instead analyzed the

The above principles reflect the longstanding interplay between the two separate interests at stake: citizens' interest in retaining possession of their property and their interest in maintaining personal privacy. These two interests roughly correspond to seizures and searches, respectively, as "[a] seizure threatens the former, a search the latter." *Brown*, 460 U.S. at 747 (Stevens, J., concurring in the judgment). This distinction, in turn, informs the plain view seizure doctrine in this context. As Justice Stevens has explained,

> As a matter of timing, a seizure is usually preceded by a search, but when a container is involved the converse is often true. Significantly, the two protected interests are not always present to the same extent; for example, the seizure of a locked suitcase does not necessarily compromise the secrecy of its contents, and the search of a stopped vehicle does not necessarily deprive its owner of possession.

---

question from the objective viewpoint of a reasonable layperson. *See, e.g.*, *United States v. Gust*, 405 F.3d 797, 803 (9th Cir. 2005) ("[C]ourts should assess the nature of a container primarily with reference to general social norms rather than solely by the experience and expertise of law enforcement officers.") (internal quotation marks and alteration omitted); *United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (holding that the defendant had no reasonable expectation of privacy in the contents of a container that was labeled "GUN GUARD" and thus was "readily identifiable as a gun case"); *United States v. Villarreal*, 963 F.2d 770, 775-76 (5th Cir. 1992) (holding that even though fifty-five gallon drums were labeled "phosphoric acid," their contents could not necessarily be "inferred"; "The fact that the exterior of a container purports to reveal some information about its contents does not necessarily mean that its owner has no reasonable expectation that those contents will remain free from inspection by others."); *United States v. Bonitz*, 826 F.2d 954, 956 (10th Cir. 1987) ("This hard plastic case did not reveal its contents to the trial court even though it could perhaps have been identified as a gun case by a firearms expert."). I believe the latter view is the proper one, because it is consistent with the underlying rationale that a person does not maintain a reasonable expectation of privacy in contents of a container that are essentially open to view.

*Id.* at 747-48.

Apart from the special concerns arising from seizures of containers, we allow police officers to seize incriminating *objects* in plain view with a showing only of probable cause because the seizure "threatens only the interest in possession;" such objects "can be seized without compromising any interest in privacy." *Id.* at 748. "[I]f an officer has probable cause to believe that a publicly situated item is associated with criminal activity" the owner's interest in possession is "diminish[ed]," and becomes "outweighed by the risk that such an item might disappear or be put to its intended use before a warrant could be obtained," and the object may be seized without a warrant. *Id.* (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 354 (1975); *Payton v. New York*, 445 U.S. 573, 587 (1980)).

Where there is a "link" between the seizure and "a prior or subsequent search," however, there is a "danger . . . that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." *Id.* Averting that danger requires not only that the officer have probable cause to connect the item with criminal behavior, but also that the seizure "entail[s] no significant additional invasion of privacy." *Id.* This danger is particularly acute where, as here, "an officer comes upon a container in plain view and wants both to seize it and to examine its contents." *Id.* at 749. The Court has "emphasiz[ed] the Fourth Amendment privacy values implicated whenever a container is opened." *Id.*

3.

In light of these controlling principles, the dispositive issues bearing on the applicability of the plain view seizure doctrine before the district court were fairly straightforward. Given the above concerns, the issues can be easily framed: Could the government justify Detective King's nonconsen-

sual, warrantless seizure of the bag, a closed, opaque container, on the one hand? Relatedly (but distinctly), did King's immediate opening of such a container constitute a "non-search" (because it does not invade its owner's reasonable expectation of privacy) or, instead, an impermissible warrantless search, on the other hand? Although the district court and the majority of the panel conclude that our *Williams* precedent provides easy answers to those questions, upon a close view of the facts in *Williams* and in light the precedents discussed above, it is clear that the majority's reliance on that case is wholly misplaced.

In *Williams*, an airline employee conducted a private search of the defendant's luggage and found several cellophane-wrapped packages that, according to her, "looked like dope." 41 F.3d at 198. She alerted police officers, who seized the packages and then removed some of the content, conducting a chemical field test that revealed that the packages contained cocaine. *Id.* at 194. The seizure was proper under the plain view doctrine, we concluded, because not only did the officers have lawful access to the packages; there was "no doubt" of the packages' "incriminating nature": "the packages were wrapped in heavy cellophane with a brown opaque material inside, and were found with towels, dirty blankets and a shirt in an otherwise empty suitcase." *Id.* at 196-97. In fact, the seizing officer later testified that "in his ten years of experience such packages *always* contained narcotics." *Id.* at 197 (emphasis added).

We then turned to whether the police needed a warrant to remove any of the contents of the packages. To justify the warrantless search, we explained, the government must not only show there was probable cause the container contained evidence of a crime, but rather that, based on characteristics of the container itself and "the circumstances under which an officer [found] the container," the contents' incriminating nature was "a foregone conclusion." *Id.* at 197 (citing *Blair*, 665 F.2d at 507). We concluded that "the incriminating nature

of the five packages found in Williams' suitcase was a fore-gone conclusion," given

> (1) the manner in which the cocaine was packaged (apparently weighing approximately one kilogram each, heavily wrapped in cellophane with a brown opaque material inside); (2) Detective Finkel's firm belief, based on his ten years' experience, that pack-ages appearing in this manner always contained nar-cotics; (3) [the airline employee's] belief that the packages contained narcotics; and (4) that the only items found in Williams' suitcase besides the five packages of cocaine were towels, dirty blankets, and a shirt with a cigarette burn.

*Id.* at 198. Because the presence of illegal narcotics in the packages was a foregone conclusion, Williams had no reason-able expectation of privacy in those contents. Accordingly, under the venerable *Katz* principle, *see Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), the offi-cers' observation of those contents did not constitute a "search," and thus "a search warrant was unnecessary." *Williams*, 41 F.3d at 198; *See Jackson*, 131 F.3d at 1108 (reaf-firming that no "search" occurs when the plain view seizure doctrine properly applies to the contents of an opaque con-tainer).

Simply put, despite the majority's labored efforts to the contrary, this case is not *Williams* or *Corral*. Most important, under a proper plain view seizure analysis, it cannot be said that a reasonable officer in King's position had "knowledge approaching certainty," *Corral*, 970 F.2d at 725, that the bag under Davis's hospital bed contained evidence of a felonious shooting in which Davis was a "victim."[14] The district court

---

[14]As noted above, a determination whether "historical facts satisfy a constitutional standard" is reviewed de novo. *Gwinn*, 219 F.3d at 331. The question whether the information available to Detective King rendered the incriminating nature of the contents a "foregone conclusion" is such a determination, as the historical facts surrounding the seizure of the bag are not in dispute.

and the majority treat the bag of Davis's clothing as analogous to the cellophane-wrapped cocaine in *Williams*. *See* Maj. Op. at 16 (holding that "the totality of the circumstances . . . support[s] the determination that it was a foregone conclusion the bag under Davis' hospital bed contained the clothing he wore when he was shot," and that the clothing was evidence of a crime). I disagree.

As a matter of law, based on what was known by the officers after they attempted to interview Davis at the hospital, the likelihood that the bag contained probative evidence of a felonious shooting in which Davis was a victim does not rise to the level of probable cause. In the first place, there is unwarranted confidence shown by the district court and the majority that Davis's pants would contain a bullet hole. *See id.* at 16-17 ("We have little trouble, however, in concluding that Davis' pants would contain a bullet hole, and would thus be incriminating evidence in the prosecution of his assailant. Such a conclusion is based on the circumstances, Davis' appearance, and the location of his bullet wound."). The facts of *United States v. Jamison*, 509 F.3d 623 (4th Cir. 2007), illustrate why this confidence is misplaced.

The defendant in *Jamison* was a felon who accidentally shot himself in the groin area with a gun he had been carrying in his waistband. 509 F.3d at 625. Like Davis here, when Jamison was transported by his associates to the hospital for treatment, he relayed to investigating officers a fanciful falsehood that he was the victim of an attempted robbery. *Id.* at 626. The investigating officer noticed Jamison's clothing on a chair in the treatment room and confirmed by the absence of a bullet hole in Jamison's pants that Jamison was lying about the circumstances surrounding how he was shot.[15] *Id.* It

---

[15]We described this turn of events as follows in our opinion reversing the district court's grant of Jamison's motion to suppress evidence for violation of the *Miranda* doctrine:

was far from "a foregone conclusion" that, apart from the likely presence of blood on Davis's clothing, the contents of the bag would serve as useful evidence in the prosecution of an illusory "shooter" about whom Davis would provide no information. Indeed, the photograph in the record of Davis's high-thigh wound depicts a wound that is entirely consistent with one that would be suffered from an accidental discharge of a weapon by someone carrying a firearm in his waistband.

Equally important, there can be scant doubt that, in view of Davis's refusal to cooperate with the officers who responded to the hospital to investigate, the HCPD officers fairly quickly turned their attention to Davis as a suspect in criminal activity, just as Jamison quickly became a suspect in his own shooting. Indeed, even the government contends on appeal (contrary to the majority's facile attempt to show that in seizing Davis's personal property the Howard County police were seeking to "protect" Davis), that the police appropriately deemed Davis to be "not an innocent crime victim." Govt's Br. at 46-47 n.13. *But see Davis*, 657 F. Supp. 2d at 640 ("Davis was positively the victim of a violent crime.").

---

Without securing Jamison's consent, Detective Macer examined Jamison's injury, partially exposing his genitalia. He found charring and stippling at the entry wound consistent with a shot fired at close range. He further observed a downward trajectory from the entry wound to the exit wound. Finding these facts to be in tension with Jamison's account of the shooting, Detective Macer then examined Jamison's clothing and found no bullet holes. Detective Macer again asked Jamison to explain the shooting; Jamison repeated that he was shot while using drugs. When Detective Macer explained that his observations seemed inconsistent with Jamison's story, Jamison admitted that he shot himself with a handgun and threw the gun away. Detective Macer asked Jamison to reveal the location of the gun so that it could be secured, but Jamison refused, explaining that he was on probation.

*Jamison*, 509 F.3d at 626-27 (footnote omitted).

The actions of the officers in searching the car in which Davis was transported to the hospital and in eventually arresting Davis and his friend bear out this highly likely scenario. Indeed, the facts of this case show that because Davis used a falsely made District of Columbia driver's license bearing his photograph under the alias "Gary Edmonds," the only way in which the HCPD could reliably identify Davis was to arrest him and take his fingerprints. That is exactly what they were determined to do and that is exactly what they did. In short, even the investigating officers did not believe Davis was a victim; rather, they were investigating his possible involvement in criminal activity. Thus, rather than accept uncritically the officers' post hoc rationalization that they needed Davis's clothing to prosecute the unknown person who allegedly shot him, under the circumstances of this case, "[w]e should be reiterating the usual exhortation: 'Get a warrant.'" *United States v. Norman*, 701 F.2d 295, 302 (4th Cir.) (Murnaghan, J., concurring), *cert. denied*, 464 U.S. 820 (1983).[16]

---

[16]A unanimous Supreme Court of Georgia recently reached the same conclusion on material facts nearly identical to those here in an interlocutory appeal in a capital case. In *Clay v. State*, 725 S.E.2d 260 (Ga. 2012), an officer had seized a bag containing a murder suspect's bloody clothing while the suspect (who, unlike Davis, was unconscious at the time of the seizure) was undergoing treatment at a hospital. 725 S.E.2d at 264, 269. The court found that the officers were not justified in opening the bag because "all that was in plain view when Officer Cupp seized the bagged clothing from the counter was the pink and white personal effects bag itself." *Id.* at 269. "[W]ithout opening the bag, it was not a 'foregone conclusion' that the bag contained [the suspect's] bloody clothes," and so the "full-blown search of the bag" constituted an unlawful search. *Id.*

Concomitantly, Davis cites to us, as he cited to the district court, a raft of cases supporting the unremarkable proposition, largely accepted by the district court but ignored by the majority, that a hospital patient retains his constitutionally protected interests in his clothing removed by hospital personnel in the course of their rendering treatment to him. *See* Appellant's Br. at 23-24 (citing *Jones v. State*, 648 So. 2d 669 (Fla. 1994); *People v. Jordan*, 468 N.W.2d 294, 301 (Mich. App. 1991); *Commonwealth v. Silo*, 389 A.2d 62, 63-67 (Pa. 1978); *People v. Watt*, 462 N.Y.S.2d 389, 391-92 (N.Y. Sup. Ct. 1983); *Morris v. Commonwealth*, 157 S.E.2d 191, 194 (Va. 1967); *People v. Hayes*, 154 Misc.2d 429, 430-34 (N.Y. Sup. Ct. 1992); *State v. Lopez*, 476 S.E.2d 227, 231-34 (W.V. 1996). Not a single one of these courts accepted the deeply flawed conception of the plain view doctrine applied by the district court in this case and accepted here by the majority.

As should thus be apparent, the "incriminating" nature of the contents of the bag here was nowhere close to being so obvious that no "search" occurred — unlike in *Williams*. In *Williams*, the drug packaging at issue was so readily recognizable that even a lay person, the airline employee who originally opened the baggage, testified that she immediately reported her discovery because "the bags looked like dope." *See* 41 F.3d at 198 (noting that "[b]ecause Lee is a layperson, not trained in law enforcement, her belief that the five packages contained 'dope' strongly supports the district court's conclusion that the contents of the packages were a foregone conclusion"). The hearing testimony in this case did not indicate that the bag was distinctive in any way; thus, the government did not satisfy its burden on that issue. Indeed, the district court noted that "[t]here was no testimony as to whether the bag was open or closed, or whether it was transparent, opaque, or somewhere in-between." *Davis*, 657 F. Supp. 2d at 638. Neither Detective King nor Lieutenant Lampe was able to provide a description of the bag beyond Lieutenant Lampe's comment that it was probably plastic.

Moreover, the *Williams* court emphasized Detective Finkel's testimony that, based on his ten years of experience in narcotics enforcement, packages of the sort at issue "*always*" contain narcotics. 41 F.3d at 198 (emphasis in original). In this case, Detective King testified on cross-examination that "the hospital makes a practice to secure any property that they take. Clothing from a victim, they place it under their bed." J.A. 147. When asked the follow up question, "So you're familiar it's the hospital's practice to secure that clothing in a white opaque plastic bag; is that correct?," Detective King responded, "It's been in different things. Sometimes it all depends on if somebody bags it or not." *Id.* In addition, as stated *supra*, neither Detective King nor Lieutenant Lampe was able to describe the bag. Detective King's testimony clearly does not rise to the level of familiarity or certainty expressed by Detective Finkel in *Williams*. Manifestly, it does not rise to Justice Stevens's "virtually certain" metric. The

government's evidence of the nature of the bag and the surrounding circumstances was equivocal at best, and clearly did not rise to the level of virtual certainty that the bag would contain contraband, which the government would have to show to establish that no "search" of the bag's contents occurred.

*Williams* is also inapposite on its facts in two additional meaningful respects, such that the case does not support, let alone dictate, the result reached by the majority. First, the *Williams* court, in language and reasoning that was wholly unnecessary to the outcome of its analysis, considered not only the extrinsic evidence of the contents of the packages, but *also* the physical appearance and character of the packages to bolster its conclusion, whereas the district court in this case considered *only* extrinsic evidence. Considering only extrinsic evidence, and not the physical appearance and character of the container itself, takes the "foregone conclusion" analysis too far from the origins of the plain view seizure container exception acknowledged in *Sanders* footnote 13, in which the Supreme Court provided the quintessential examples of a single-purpose container, namely "a kit of burglar tools or a gun case." 442 U.S. at 764 n.13. The *Sanders* Court noted that the contents of such containers "can be inferred from their outward appearance." *Id.* Narcotics packaging is so readily recognizable as to rise to the level of the archetypal kit of burglar tools or a gun case. A non-descript plastic bag does not so betray its contents.[17]

---

[17]None of the cases cited by the government in support of its reconceptualization of the plain view seizure doctrine are to the contrary. *See United States v. Jackson*, 381 F.3d 984 (10th Cir. 2004) (after officer searched baby powder container with defendant's consent and discovered cocaine secreted inside, officer could replace lid to container, arrest defendant, and then reopen the container at the police station without obtaining a warrant); *United States v. Eschweiler*, 745 F.2d 435, 455 (7th Cir. 1984) (during search of premises, key to safety deposit box discovered in an envelope marked "safety deposit box"); *United States v. Morgan*, 744 F.2d 1215, 1222 (6th Cir. 1984) (after airline employee opened suspicious

Second, and critically, the search in *Williams* was a search for contraband and not mere evidence of someone's criminal act.[18] For the reasons expressed above, *see supra* pp. 65-66, in addition to his possessory interest in the bag and its contents, Davis clearly enjoyed a reasonable expectation of privacy in his own clothing and their contents every bit as much as he enjoyed a reasonable expectation of privacy, as the majority rightly holds, in the chemical facts concerning his biological material and blood.[19] Indeed, it is curious, to say

---

package and discovered container marked with names of controlled substances used to dilute illegal narcotics, and then without a request by drug agents, reopened suitcase when drug agents arrived, chemicals were in "plain view" of agents and marked containers could be opened without a warrant).

[18]Of course, I do not seek a return to the "mere evidence" doctrine discarded by the Supreme Court in *Warden v. Hayden*, 387 U.S. 294, 301-02 (1967). Rather, the point here is that my search of Supreme Court and circuit authority, as I discuss in the text, does not reveal an instance in which a law enforcement officer has been authorized to seize a closed, opaque container containing non-contraband personalty from the possession of a person on the basis of the plain view exception. In such circumstances, even assuming a seizure is allowed, absent some applicable warrant exception, if the ensuing search of the container was without a warrant, the search violates the Fourth Amendment. Ample Supreme Court authority supports this view. *See supra* pp. 64-67.

[19]In contrast, one never has a reasonable expectation of privacy in regard to his possession of contraband. *See United States v. Moore*, 562 F.2d 106, 111 (1st Cir. 1977) (observing that "the possessors of [contraband and stolen property] have no legitimate expectation of privacy in substances which they have no right to possess at all"), *cert. denied*, 435 U.S. 926 (1978); *cf. Jacobsen*, 466 U.S. at 123 ("A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy."). *Jacobsen* and the cases relied on by the majority, *see* Maj. Op. at 17-18, are entirely consistent with this longstanding rule. *See, e.g.*, *United States v. Smith*, 459 F.3d 1276, 1293 (11th Cir. 2006) (plain view seizure of child pornography in the course of a search for narcotics); *United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010) (where officers came upon a sawed-off shotgun in the course of responding to a domestic violence call, the court reasoned that, "The shotgun was properly seized on a temporary basis to secure it so that the officers could investigate the domestic disturbance call. Once seized for this purpose, the incriminating nature of the weapon became apparent and it was then subject to permanent seizure as contraband.").

the least, to reason as does the majority that Davis retained, for several years after the bag was seized at the hospital, a reasonable expectation of privacy in the character of his DNA molecules, but that he lacked any reasonable expectation of privacy in the presence of those molecules in his blood while they were embedded in his clothing and hidden from the government in a bag which was effectively in his actual possession at the hospital. Thus, I would limit *Williams* and its reliance on extrinsic indicia of the container's contents to cases involving the plain view seizure of containers holding contraband.

For all these reasons, *Williams* does not control the outcome in this case.[20]

## C.

For the foregoing reasons, unlike the majority, I would hold, at minimum, that not only the extraction of Davis's DNA, the creation of his DNA profile and its retention in the local DNA database violated Davis's constitutional right to be

---

[20]In fairness to my well-meaning colleagues in the majority, they are not the first judges to misapply the plain view seizure doctrine. *See, e.g.*, *Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) (discussed *supra* n.5.) For example, in jurisdictions such as Maryland, where transporting an unsecured handgun in a vehicle is generally prohibited, if during a traffic stop an officer observed from outside the vehicle the barrel of a handgun, it is not the plain view seizure doctrine that authorizes the officer to enter the vehicle to seize the weapon. Rather, now with probable cause to arrest all the occupants, *see Maryland v. Pringle*, 540 U.S. 366 (2003), and with probable cause to believe that the vehicle contains evidence of a criminal offense, the officer can search the vehicle and seize the firearm under either the search incident to arrest exception or the automobile exception to the warrant requirement. *See id.* The officer's view of the firearm was certainly "plain" in the "Merriam Webster" sense, but there is no occasion for proper application of the plain view seizure doctrine. Whether such cases come to the court by virtue of governmental theorizing or otherwise I cannot say, but we should guard against, rather than embrace, such distortions of doctrine.

free from unreasonable searches, but that the nonconsensual, warrantless search of the bag containing his personal effects likewise violated that right. Accordingly, I respectfully dissent from the majority's contrary resolution of the merits of the Fourth Amendment issue. "[T]he value of the Fourth Amendment derives from the consideration that only when it is applied evenhandedly-to smugglers, murderers, and rapists as well as to others-does it retain its effectiveness for the decent citizenry." *Norman*, 701 F.2d 295 at 302 (Murnaghan, J., concurring). I regret the majority's distortion of the plain view doctrine in order to save the unconstitutional search challenged in this case.

## III.

The majority, having concluded that only the extraction and analysis of Davis's DNA by the PGCPD violated the Fourth Amendment, and having assumed that the retention of his DNA in the local CODIS database was a further violation, nevertheless refuses to apply the exclusionary rule. I respectfully dissent from that choice. I would find that the district court erred in admitting evidence flowing from the HCPD's unlawful seizure and search of Davis's clothing and the PGCPD's unlawful extraction, analysis and retention of his DNA profile, including in particular the evidence of the match between the known sample obtained pursuant to the search warrant and DNA recovered from the scene of the Schwindler murder. Because this case does not fall within any version of the "good faith" exception recognized under extant Supreme Court or Fourth Circuit precedent, I would reject the district court's decision not to apply the exclusionary rule.

The Fourth Amendment protects the fundamental "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, but "contains no provision expressly precluding the use of evidence obtained in violation of its commands," *Arizona v. Evans*, 514 U.S. 1, 10 (1995). Thus, the

Supreme Court created the exclusionary rule, an auxiliary to the Amendment which "compel[s] respect for the constitutional guaranty," *Elkins v. United States*, 364 U.S. 206, 217 (1960), by forbidding the use of illegally obtained evidence at trial. *See Weeks v. United States*, 232 U.S. 383 (1914) (adopting federal exclusionary rule); *Mapp v. Ohio*, 367 U.S. 643 (1961) (applying exclusionary rule to the states through the Fourteenth Amendment). Suppression is not an automatic consequence of all Fourth Amendment violations, however. *See Herring v. United States*, 555 U.S. 135, 137 (2009).

The Supreme Court created the "good-faith" exception to the exclusionary rule in *United States v. Leon*, 468 U.S. 897 (1984). In *Leon*, the Court held that the exclusionary rule does not apply when the police conduct a search in "objectively reasonable reliance" on a warrant later held invalid. *Id.* at 922; *see also Massachusetts v. Sheppard*, 468 U.S. 981, 990-91 (1984) (companion case declining to apply exclusionary rule where warrant held invalid as a result of judge's clerical error). In the twenty-eight years since deciding *Leon*, a sharply-divided Supreme Court has applied variations on the *Leon* good-faith exception in several specific circumstances. In *Illinois v. Krull*, 480 U.S. 340 (1987), the Court applied the good-faith exception to a search conducted in reasonable reliance on a subsequently invalidated statute. *Id.* at 349-50. In *Evans*, 514 U.S. 1, the Court applied the good-faith exception where police reasonably relied on erroneous information concerning an arrest warrant in a database maintained by non-law enforcement, judicial employees. *Id.* at 6, 14-16.

More recently, in *Herring*, decided approximately nine months prior to the district court's decision in this case, the Supreme Court addressed a question left unresolved by *Evans*, namely "whether the evidence should be suppressed if police personnel were responsible for the error." 555 U.S. at 142-43 (quoting *Evans*, 514 U.S. at 16 n.5) (internal quotation marks omitted). Considering whether the exclusionary rule applies where police failed to update records in a warrant

database, leading to the unlawful arrest of the defendant on the basis of a recalled warrant, the *Herring* Court held, over a spirited dissent, that where "the error was the result of isolated negligence attenuated from the arrest . . . the jury should not be barred from considering all the evidence." *Id.* at 137-38. The Court reasoned that, "when police mistakes are the result of negligence . . . , rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way." *Id.* at 147-48 (internal quotation marks omitted). Most recently, the Court in *United States v. Davis*, 131 S. Ct. 2419 (2011), applied a further variation on the *Leon* good-faith exception where police conducted a search in objectively reasonable reliance upon binding judicial precedent that was later overruled. *Id.* at 2423-24.

The majority reasons that, "[i]n order to properly apply *Leon*, *Herring*, and *Davis* here, we must focus on the culpability of the actors who committed the violations." Maj. Op. at 45. The majority assumes without discussion that *Leon* and its progeny govern here, and thus proceeds directly to the broad cost-benefit analysis that underlies the narrow holdings in those cases. As discussed *infra*, however, each of the cases upon which the majority relies is clearly distinguishable from the case at bar. Thus, the majority's application of the good-faith exception to preclude suppression in this case marks a departure from the Supreme Court's exclusionary rule precedents and represents a new, free-standing exception never sanctioned by the Court or by precedent in this Circuit.

In *Leon*, *Krull*, *Evans* and *Davis*, the Supreme Court reasoned that exclusion does not serve to deter unconstitutional police conduct where the actor primarily responsible for the Fourth Amendment violation is not a law enforcement officer. *See Leon*, 468 U.S. 897 (magistrate judge); *Krull*, 480 U.S. 340 (legislators); *Evans*, 514 U.S. 1 (clerk in the employ of the judiciary); *Davis*, 131 S. Ct. 2419 (judiciary). This rationale clearly does not apply here, where HCPD and PGCPD employees violated the Fourth Amendment. In this respect,

our case is most like *Herring*, which also dealt with unconstitutional conduct by law enforcement personnel. Nevertheless, *Herring* is likewise inapplicable because it crafted a narrow exception to the exclusionary rule that applies only where "the error was the result of isolated negligence attenuated from arrest." 555 U.S. at 137. The majority fails to recognize that neither of the qualifiers present in *Herring*, namely "isolated negligence" and "attenuation," is present here.

Instead, the record in our case shows unmistakably that the constitutionally violative conduct is not only deliberate and intentional but is systemic; most assuredly, it was not an isolated blunder. Detective King testified that, as on previous occasions when he has responded to Howard County General Hospital to investigate shootings, hospital personnel did not assist him in obtaining Davis's effects. This statement indicates that Detective King has seized patients' belongings in the manner at issue here on other occasions. *See supra* n.11. In addition, the DNA analyst who entered Davis's profile into the local CODIS database testified that she was aware that Davis had been cleared of suspicion in the Neal murder before his DNA profile was added to the local CODIS database.

Furthermore, the "Request for Examination" form submitted to the PGCPD Serology DNA Laboratory ("DNA Lab") along with Davis's bloody clothing indicated that "these samples are from a shooting the suspect was a victim of in Howard Co. MD." Supp. J.A. 76. The DNA analyst testified that the database contained profiles of both suspects and victims, indicating that the PGCPD regularly retained the DNA profiles of persons, such as Davis, who had not been arrested, charged with, or convicted of any crime. The government confirmed at oral argument that it was the PGCPD's policy to upload *every* DNA profile it analyzed into the local CODIS database, regardless of the individual's status, the method by which the sample was obtained, or whether the sample might be tainted by an antecedent constitutional violation. Oral Arg. Tr. at 28:40. Thus, the record indicates that the PGCPD ana-

lyst and officers knew that Davis was a victim at the time the sample was collected, that Davis was not a suspect when his DNA profile was entered into the local database, and that it was the PGCPD's policy and practice to retain the DNA profiles of such persons. Thus, by the government's own admission, the constitutionally violative conduct was clearly systemic. *See Hudson v. Michigan*, 547 U.S. 586, 604 (2006) (Kennedy, J., concurring in part and concurring in the judgment) (opining that, "[i]f a widespread pattern of violations were shown, and particularly if those violations were committed against persons who lacked the means or voice to mount an effective protest, there would be reason for grave concern").

The expungement provisions in the Maryland and federal indexing statutes also recognize a privacy interest for those in Davis's position. As the district court recognized, "[b]oth laws require that an individual's DNA record be expunged from the database if the defendant is never convicted, his conviction is reversed or vacated, or the charges are dismissed." *Davis*, 657 F. Supp. 2d at 659 (citing 42 U.S.C. §§ 14132(d)(1)(A)(i)-(ii); 42 U.S.C. §§ 14132(d)(2)(A)(i)-(ii); Md. Code Ann., Pub. Safety § 2-511). While "[t]he expungement provisions do not directly apply to Davis' situation because they are drafted specifically to address circumstances in which an individual's DNA was placed in the database on the basis of a conviction or arrest," I agree with the district court that "the construction of the statute strongly suggests that Congress and the Maryland legislature respected the privacy interest of those individuals never convicted for qualifying offenses, and did not intend for ordinary citizens' or victims' DNA to be included in the database." *Id.*

In addition, unlike the constitutionally violative conduct at issue in *Herring*, the conduct in this case is not "attenuated" from the discovery of Davis's identity as the source of the DNA recovered from the scene of the Schwindler murder; the cold hit which led to Davis's arrest was a *direct result* of the

seizure and search of his clothing and the subsequent extraction, analysis and retention of his DNA profile. *Cf. Hudson*, 547 U.S. at 592 (exclusionary rule inapplicable where violation of the knock and announce rule was not but-for cause of obtaining evidence pursuant to search warrant). Given that the cold hit supplied the sole probable cause for the search warrant leading to the known DNA match, the causal connection required to invoke the exclusionary rule is clearly present in this case.

As we recognized in *United States v. Oscar-Torres*, 507 F.3d 224 (4th Cir. 2007), application of the exclusionary rule is the "usual remedy" where evidence of identity is derived from unlawful searches and seizures:

> Indisputably, suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Courts will also suppress evidence that is the indirect product of the illegal police activity as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Of course, not all evidence that "would not have come to light but for the illegal actions of the police" is suppressible as fruit of the poisonous tree. *Id.* Rather, the critical inquiry is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (internal quotation marks omitted).

*Id.* at 227. There is no real dispute that the seizure of the bag containing Davis's clothing, the search of the bag and of Davis's clothing, including the extraction of his DNA therefrom, and the subsequent creation and uploading of his DNA profile, means that the identification evidence introduced at trial was the product of an "exploitation" of the searches and

seizures at issue in this case.[21] Rather than noting the critical distinctions between our case and extant good-faith exception precedents, the majority invents an ad hoc version of the exception by focusing on broad principles espoused by the *Herring* Court, including most notably its admonition that the deterrent effect of exclusion must outweigh its costs. This is unsurprising, perhaps, given that the *Herring* Court's "'analysis' . . . far outruns the holding." Wayne R. LaFave, *The Smell of Herring: A Critique of the Supreme Court's Latest Assault on the Exclusionary Rule*, 99 J. Crim. L. & Criminology 757, 770 (2009). In other words, there is a gap between the holding of *Herring*, which is quite narrow, and its rationale, which sweeps quite broadly. We should not so readily depart from the narrow holding of *Herring*, and the Supreme Court's other good-faith exception jurisprudence, given the critical role that the exclusionary rule plays in ensuring the vitality of the Fourth Amendment.

The rule provides an essential "incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment," *Illinois v. Gates*, 462 U.S. 213, 221 (1983) (White, J., concurring in judgment), thereby "safeguard[ing] Fourth Amendment rights generally through its deterrent effect," *United States v. Calandra*, 414 U.S. 338, 348 (1974). *See also Herring*, 555 U.S. at 152 (Ginsburg, J., dissenting) (describing exclusionary rule as a "remedy necessary to ensure that the Fourth Amendment's

---

[21]We and other circuits have recognized what is surely obvious: the *Leon* good-faith exception does not salvage evidence seized on the authority of a tainted search warrant, i.e., one in which probable cause is based on the fruits of a prior illegal search, as in this case. *See United States v. Mowatt*, 513 F.3d 395, 405 (4th Cir. 2008) (good-faith exception does not apply where search warrant was prompted by previous warrantless illegal search), *abrogated on other grounds*, *Kentucky v. King*, 131 S. Ct. 1849 (2011); *United States v. McGough*, 412 F.3d 1232, 1240 (11th Cir. 2005); *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996); *United States v. Scales*, 903 F.2d 765, 768 (10th Cir. 1990); *United States v. Wanless*, 882 F.2d 1459, 1466 (9th Cir. 1989).

prohibitions are observed in fact") (internal quotation marks omitted); *cf. United States v. Jones*, 678 F.3d 293 (4th Cir. 2012).[22]

In this case, the HCPD officers deliberately and intentionally dispossessed Davis of his personal property. The HCPD officers then deliberately and intentionally retained that property. Then, the HCPD deliberately and intentionally delivered that property to the PGCPD officers, who deliberately and intentionally made a request for it. Having thus obtained possession, the PGCPD officers then deliberately and intentionally delivered Davis's property to their DNA lab for analysis and uploading into the local CODIS database, and, of course, the analyst, charged with knowledge that she was handling biological material taken from a crime victim, deliberately and intentionally uploaded the DNA profile into the database. This case is a poor candidate for the creation of a new variation on the good-faith exception to the exclusionary rule.

Davis has been convicted of a heinous crime. The cold-blooded mid-day murder of Jason Schwindler, a man simply conscientiously going about his work to support himself and his family, understandably generates outrage and dismay, an all-too-common episode of modern life from which all decent people recoil in horror. There is little reason to doubt that customary, equally conscientious, work by dedicated state and federal law enforcement officers would have brought

---

[22]As we explained in *Jones*,

the exclusionary rule is our sole means of ensuring that police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone," regardless of where that person resides or visits. *United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011). Accordingly, we find the exclusion of evidence to be the proper remedy in this case because of the "the potential . . . to deter wrongful police conduct." *See Herring v. United States*, 555 U.S. 135, 137 (2009).

678 F.3d at 305, n.7.

deserved justice to those who participated. Nevertheless, duty to the judicial oath requires that we apply the law faithfully and evenhandedly.[23]

In short, I would apply the exclusionary rule in this case and leave it to the Supreme Court to extend the good-faith exception to the particular situation now before us, should it see fit to do so. I am mindful that the obituary marking the long slow death of the exclusionary rule has been written long before the rule will be interred.[24] Understandably, perhaps, there has been no want of volunteers among the judiciary to serve as pallbearers. I regret this development and fear that a measureable lessening in liberty will result from this freeing of law enforcement from the constraints of the Fourth Amendment through the invention of an ad hoc good-faith exception to suppression of unlawfully obtained evidence. To quote the second Justice Harlan, "I can see no good coming from this constitutional [mis]adventure." *Ker v. California*, 374 U.S. 23, 46 (1963) (Harlan, J., concurring in the judgment).

\* \* \* \* \*

For the reasons set forth, I respectfully dissent.

---

[23]I respect my good colleagues' discomfort with a reversal in this case, a discomfort that is shared by all members of this panel. *Cf. Blair*, 665 F.2d at 509 (Murnaghan, J., dissenting) ("Whenever the exclusionary rule applies, with the resulting suppression of trenchant evidence of guilt, and the substantial and regrettable consequence that an offender against society may go free, the judge is apt to wince or at least to feel a twinge."). Nevertheless, without clearer, more definitive instructions from the Supreme Court than those relied on by the majority, "We should not avoid or vitiate the effectiveness of the exclusionary rule by distorting what constitutes the essential ingredients of a proper search or seizure." *Id.*

[24]*See* Adam Liptak, Supreme Court Edging Closer to Repeal of Evidence Ruling, N.Y. Times, Jan. 31, 2009, at Al.